T. Roland BERNER and Arthur S. Lesser, Executors of the Estate of William Kapell, deceased, Plaintiffs,

v.

BRITISH COMMONWEALTH PACIFIC AIRLINES, LTD., a Foreign Corp., and British Commonwealth Pacific Airlines, Ltd., now doing business as Qantas Empire Aviation, Ltd., a Foreign Corp., Defendants.

United States District Court
S. D. New York.
June 28, 1963.

Belli, Ashe & Gerry, by Melvin M. Belli, and Richard F. Gerry, San Francisco, Cal., and T. Roland Berner, by Sidney Bender, M. Victor Leventritt, New York City, for plaintiffs.

Condon & Forsyth, by Austin Magner, and George N. Tompkins, Jr., New York City, Wallace & Parker, by Charles F. Parker, San Francisco, Cal., for defendants.

Before RITTER, District Judge.

A Douglas DC-6, VHBPE, owned and operated by British Commonwealth Pacific Airlines, Ltd. (BCPA), crashed near Half Moon Bay, California, at approximately 0844 Pacific Standard Time, October 29, 1953. The aircraft was destroyed by impact and subsequent fire. The eight crew members and eleven passengers were killed. Plaintiffs' testate, William Kapell, was one of those passengers.

This action is brought to recover damages for the death of William Kapell. It was tried to the court and jury and resulted in a verdict for the defendants, no cause of action.

The plaintiffs have moved the court, pursuant to Rule 50(b)_of the Federal Rules of Civil Procedure for the following relief:

(1) A directed verdict in favor of the plaintiffs on the issue of liability, and a new trial, limited to the issue of damages only.

(2) Judgment *non obstante veredicto* for the plaintiffs on the issue of liability, and a new trial, limited to the issue of damages only.

(3) A new trial on all issues.

The issues presented by the foregoing motions, of course, require for their determination an examination of all of the evidence.[1]

1. 2000 pages of transcript of the trial in New York. 500 pages of transcript of argument in Salt Lake City, April 14, July 12 and 13, 1961; and four briefs on each side.

■ Since this was an international flight, and there was a contract of carriage between the deceased and the airline, the provisions of the Warsaw Convention[2] govern.

The flight was scheduled between Sydney, Australia, and San Francisco, California, with intermediate stops at Nandy, Figi Island, Canton Island, and Honolulu, T. H.

The flight to Honolulu was without incident, and the pilot who flew the aircraft during this entire period stated that the aircraft was normal in all respects.

In Honolulu a new crew came aboard after a 36 hour rest period. They were briefed on expected en route and terminal weather by U. S. Weather Bureau personnel.

The crew filed an IFR (Instrument Flight Rules) flight plan with ARTC (Air Route Traffic Control) which indicated a rhumb line course was to be flown to San Francisco, with Sacramento, California, the alternate airport. The estimated flying time of the flight was nine hours and twenty-five minutes. And, there was fuel on board for twelve hours and fifty-three minutes.

The aircraft departed Honolulu at 2259, October 28, 1953. According to company records, the gross take-off weight of the aircraft was 90,166 pounds, which was below the allowable gross take-off weight of 95,200 pounds, and the load was distributed properly with respect to the center of gravity of the aircraft.

Propeller difficulty reported shortly after take-off from Honolulu probably had no bearing on this accident. The trouble was reported by the flight to have been eliminated, and no further reference was made to it in the numerous communications throughout the extensive flight. No claim for it has been made by defense counsel.

No reference in those numerous communications was made to any trouble of any kind. (Exh. 64, Trip following form; Exh. 65, Post flight analysis: "Aircraft normal up to Half Moon Bay. Reported to tower over HMB at 0839"). The flight from Honolulu to Half Moon Bay fan marker was uneventful.

## I. The Clearances.

As the flight proceeded across the Pacific Ocean, from Honolulu to San Francisco, hourly routine position reports were made to OFACS (Overseas Foreign Aeronautical Communication Station), to Honolulu before the aircraft reached the half-way point, 138 degrees west longitude, and to San Francisco after that point was passed.

The chief, at the time of the accident, of the Air Route Traffic Control Center at Oakland—a federal government agency to provide air traffic separation to en route aircraft—testified:

We communicated with aircraft over the ocean in 1953 in this fashion: The crew aboard the airplane would report by code ordinarily to a CAA communications facility which was located at San Francisco Airport. This report would be copied by the communicator and immediately telephoned to the Oakland Traffic Control Center. If we had advice or clearance for the aircraft, the procedure would be reversed. We would call the CAA communication station in San Francisco. They would copy the clearance, call the pilot by radio-telephone, and deliver it.

When an airplane received a message from the San Francisco overseas radio, the plane acknowledged receipt of the message. It was the custom and practice, though there was nothing on the messages to indicate whether or not such acknowledgment was made in each case.

---

2. Convention for the Unification of Certain Rules Relating to International Transportation by Air and Additional Protocol, concluded at Warsaw, Poland, October 12, 1929. Adherence to the Convention was advised by the United States Senate, June 15, 1934, and proclaimed by the President of the United States, October 29, 1934. Treaty Series No. 876, 49 U.S. Statutes at Large, page 3000 et seq.

In 1953 we didn't communicate directly with any aircraft. Oakland Traffic Control followed the plane in from 138 west. The Traffic Control Center releases jurisdiction of an inbound flight to the destination tower fifteen to twenty-five miles away from the airport. In this particular instance, as I recall, the traffic control responsibility was changed over at Half Moon Bay.

Ordinarily we would clear him to a fix called the approach control holding fix, which at the time of this incident was the outer marker of the ILS system, and, as I recall, this aircraft was cleared to that fix.

The route specified was Half Moon Bay direct to the outer marker, as I recall.

The altitude was given, at least 500 feet on top.

At 0550 Pacific Standard Time, the flight sent the following message:

"VHBPE position 32.39 N. 134.40 W. Time 1350 Z (0550). Altitude 11,500. Track 064 degrees. Ground speed 225 knots. Wind 030 degrees 25 knots. (Estimating over SFO at 1640 Z (0840). Estimating arrival at blocks 1650 Z (0850)."

This report indicated there was no trouble, and that the crew thought the flight was going to continue according to schedule, as it had all the way across from Honolulu. And, of course, as it did until it arrived at Half Moon Bay.

Communications to and from the flight were changed from code to voice after that message.

In answer to a request from the flight, San Francisco ARTC (Air Route Traffic Control Center at Oakland), at 0807, Pacific Standard Time, cleared it to descend in accordance with Visual Flight Rules and to *"Maintain at least 500 on top"* of the clouds. This was by *voice* contact with the flight.

The flight reported that it was starting descent at 0815, and at that time was given the San Francisco 0800 weather:

"Measured ceiling 1,200 feet, broken, visibility nine statute miles, temper-ature 54, dew point 50, wind west 12 knots and altimeter 30.13."

This, also was by *voice* contact with the flight.

As the aircraft approached the California coast, Western Air Defense Force Radar identification zone personnel, "Sliphorn", located at Mount Tamalpais, ordered it to execute the check turn, which it did. It was thought there might be foreign aircraft flying near our coast at that time. The check turn was executed between 150 miles out and 60 miles out. It was identified and released from corridor assignment at 0821 Pacific Standard Time. Both of these communications, again, were by *voice* contact with the flight.

Western Air Defense Force Radar personnel reported the position of this BCPA aircraft 0821, Pacific Standard Time, at 36 degrees 38 minutes north, one hundred twenty three degrees 31 minutes west. Within a minute or two of that time, the aircraft reported its ground speed at 225 knots and estimated its arrival over SFO at 0840 and at the blocks at 0850.

There was a definite fix on her at 0821. At that time, eighteen minutes before the pilot reported over Half Moon Bay, the flight was about 70 miles off the coast.

At 0827, Pacific Standard Time, Air Route Traffic Control Center transmitted to this aircraft through OFACS (Overseas Foreign Aeronautical Communication Station) the following clearance:

"ATC clears VHBPE to the San Francisco ILS outer marker via the Half Moon Bay fan marker *direct to the San Francisco ILS outer marker. Maintain at least 500 feet above all clouds*. Contact San Francisco approach control after passing the Half Moon Bay fan marker. Cloud tops reported in the Bay area 1700 feet."

This message, also, was by *voice* contact with the flight. Moreover, it was acknowledged and repeated back by the flight.

At this time the Air Route Traffic Control Center at Oakland estimated the arrival of the BCPA aircraft at the San Francisco outer marker at 0849, Pacific Standard Time.

In its 0827 clearance ARTC transferred control of the flight to San Francisco Approach Control. It was the custom for the flight on crossing the coastline to transfer to San Francisco Approach Control pursuant to the terms of such clearance.

At 0839, the flight called San Francisco Approach Control on 3105 kilocycles, identified itself as "Air Pacific Echo" and advised that it was over Half Moon Bay, 500 on top and was listening on 278 kilocycles.[3]

Approach Control acknowledged, and repeated, the pilot's report over Half Moon Bay, and sent a clearance all in one transmission:

"A-P-E, San Francisco Approach Control, Half Moon Bay three nine *at least five hundred on top;* cleared for an ILS approach to the airport, Runway two eight right, wind west one five; *cross the outer marker initial(ly) at least five hundred on top,* report when inbound; ceiling one thousand two hundred, visibility nine, altimeter 30.14, over."

That message also, was by *voice* contact with the flight, *was acknowledged by the flight and repeated back.*

Approximately three minutes later, the flight made a report which was acknowledged by the controller as "Air Pacific Easy, Roger, southeast, turning inbound"; the controller then added, "check passing the ILS outer marker inbound."

At 0845 a call to the flight was unanswered as were all subsequent calls.

The evidence is that this aircraft crashed at approximately 0844 on King's Mountain, about ten and one-half miles from the ILS outer marker.[4]

The aircraft was flying on an approximate heading of northeast by north when it first struck the trees. The elevation of the first tree struck was 2020 feet.

A telegram from the Manager at the San Francisco office to the General Manager of British Commonwealth Pacific Airlines in Australia, dated October 30 at 0240 time, stated: "Aircraft apparently heading parallel range leg, but about eight miles south of same just prior to crash."

The landing gear was down and locked at impact. The flaps were extended between 15 and 20 degrees. The major portions of the control surfaces were

3. Captain Lucas, defendant's witness, told us how the calls would be made (T.): "Witness: Yes, on making his initial call to the San Francisco Approach Control he would make a call something like this: San Francisco Approach Control, Air Pacific Baker-Peter-Easy, and he would normally nominate the frequency he was transmitting on, and then wait for a reply from the ground communications officer proving that he had actually established contact with him. "Question: Then would they wait for a call from San Francisco Approach control? "Witness: That is correct. San Francisco Approach Control, if he received the transmission, would come straight back normally, provided, of course, he was not busy with other traffic, and tell him to go ahead with his message. "Question: And then the pilot would go ahead with his message back?

"Witness: That's right. And then the pilot would transmit the message which, well, in this particular approach, would be Half Moon Bay, at time, and an altitude." This is the "PTA", i. e. position, time, and altitude Captain Brand told us about (T. 808), and this appears to have been the custom and practice. So, the time "0839" was given approach control by the pilot when he reported over Half Moon Bay. The controller, Mr. Stone, agreed, but on cross examination did not have a clear memory.

4. The distance between the Half Moon Bay fan marker or intersection and the ILS outer marker is about 12 miles. The distance between the crash site and the ILS outer marker is about 10½ miles. The distance between the crash site and the center of the Half Moon Bay fan marker is about 8½ miles.

located with the main wreckage. Many broken and burned control cables were examined and these, together with other components of the control system, failed to reveal any evidence of failure or malfunction prior to impact. At far as could be determined from an examination of the damaged airframe components, there was no evidence to indicate that the aircraft was not airworthy prior to the crash. The propeller governors from Nos. 2 and 3 engines were found and although badly burned, comparative tests were possible which revealed r. p. m. settings of approximately 2400. As far as could be determined from an examination of the damaged engines and components, there was no indication that a malfunction or failure had occurred prior to impact. The aircraft was in an airworthy condition according to the laws of the Australian Government when it departed Sydney. Two communication receivers were found tuned to 278 kc., the frequency of the San Francisco tower. The marker beacon receiver hi-lo switch was in the "hi" position. The ADF receivers were so badly damaged it was impossible to determine their settings. One altimeter was recovered with a barometric setting of approximately 30.12; the latest setting given the flight was 30.14. This difference amounts to approximately 20 feet of altitude. A clock was impact stopped at approximately 1640 (0840).

Three times the flight was ordered to maintain *at least five hundred feet above all clouds.* Twice—at 0827 by ARTC to fly from the Half Moon Bay fan marker *"direct* to the San Francisco ILS outer marker; maintain at least 500 above all clouds", and, at 0839 by San Francisco Approach Control to "cross the outer marker initial(ly) at least 500 on top"— twice the flight was *ordered to fly to the ILS outer marker,* and to maintain at least 500 feet above all clouds between Half Moon Bay fan marker and the ILS outer marker.

All three of these clearances were *by voice contact with the crew,* and the *two clearances directing the flight to go to the ILS outer marker were acknowledged and read back* by a crew member, no doubt the pilot.

No one, seriously, could urge that the crew did not receive or understand these three clearances. And, there could have been no doubt in this pilot's mind as to what he should have done.

Nevertheless, it is obvious that the flight did not maintain at least 500 on top. And, neither did it fly from the Half Moon Bay fan marker "direct to the San Francisco ILS outer marker", nor "cross the outer marker initial(ly) at least 500 feet on top." When you are given a clearance direct from Half Moon Bay fan marker to the ILS outer marker, you cannot go in any other direction than a straight line, one to the other. The pilot did not maintain five hundred feet above all clouds until he had crossed the ILS outer marker. The pilot did not fly that aircraft to the ILS outer marker at all.

For a time, defendants urged that he might have flown from the Half Moon Bay fan marker, or intersection, to the ILS outer marker, made the required turn, and returned to the crash site. But, they have given that up, and now admit that the time interval was too short, and that he didn't do that. All of the pilot witnesses on both sides said he could not have done that.[5]

5. Captain Brand (T. 852–854); Captain Smith (T. 1273–1274); and, Captain Lucas, defendant's witness, (T. 1142–1143): "Question: Let me ask you, Captain, between 0839 and 0844 could this pilot have gone from the Half Moon Bay fan marker to the ILS outer marker, made a reversal turn, come back to the area of the crash, made a second reversal turn, crashed, headed in a northeasterly direction with his gear down and locked and his flaps extended 15 to 20 degrees?
  "Witness: You are now speaking of the actual geographical position?
  "Question: Yes.
  "Witness: No, he could not have done that.
  "Question: And the same would be true from Half Moon Bay intersection, if we use that as our first reference point?
  "Witness: Yes."

Under the clearance given this pilot by San Francisco Approach Control he could not, without violating his clearance, have descended into the clouds before receiving the signals of the ILS outer marker. He could not have let down into the clouds until he established himself over the ILS outer marker, at the west end of the San Mateo bridge.

## II. The ILS Outer Marker Signals.

The ILS outer marker, to which this flight was cleared, is the key to the Instrument Landing System at the San Francisco International Airport. So, it is necessary to examine the evidence in respect to that marker in detail and with some particularity.

There are two transmitters at the ILS outer marker: (1) the 75 megacycle marker beacon transmitter, and (2) the compass locator transmitter.

First, the 75 megacycle marker beacon transmitter is a 5 watt transmitter. It has low power to radiate the signal over a small area, with narrow and precise limits. The pattern of the signal is more in an upward direction than outward, and it gives the small elipse that is shown on the chart. (Appendix "A", Exhibit 55). The objective in the design of this equipment is to provide a location in space over a point on the ground so that the pilot may, when he is over the place, know precisely when he is there. This is the function of the device. When the pilot flies over this geographical location, and passes through the cone of the signal pattern he receives the signals from the 75 megacycle marker beacon transmitter. The signals received from this facility are both aural and visual. In the earphones the pilot receives a continuous series of Morse Code dashes: da da da da da da da. And, at the same time he sees a blue or blue-purple light flashing the Morse Code signal on his marker beacon receiver on the dashboard in the cockpit. The marker beacon receiver in the aircraft receives both of these signals.

Second, the compass locator transmitter is on 350 kilocycles. It radiates a signal in every direction. It is a nondirectional signal, that can be picked up any place within range of the station, in 1953 as far as twenty five miles. This signal is picked up on the automatic direction finding equipment in the aircraft —the ADF. The compass locator transmitter activates the needle on the ADF in the cockpit, so that the needle points to the station. The pilot tunes the ADF to 350 kilocycles and identifies the station by its identifier—in this case it is "SF". The compass locator transmitter sends out a signal which is Morse Code for "SF"—three dots, a pause, then two dots, a dash, and a dot.

The station is "SFO", that is, San Francisco. No matter where the pilot picks this up, when he tunes to 350 kilocycles the needle will point to the station. And, that is why, when the aircraft flies across and passes over the station the needle reverses, and points back toward the station. The reversal of the needle signal comes from this facility.

If the aircraft passes to the side of the station, the ADF will eventually get a needle reversal, but it will be different. If the aircraft passes directly over the station, the needle will waver as the flight gets over it and then the needle will reverse immediately after the aircraft passes over the station, and will point back to it. If, however, the aircraft passes to the side of the station, the needle will continue to point to the station as the flight goes by. Therefore the pilot knows that he isn't passing over. He doesn't get the waver and turn; instead he gets a continuous pointing to the station and the bearing continually changing over a considerable period of time.

That is why, in order to identify this particular place, it was required that the flight receive a signal from both of these facilities. And, in this case BCPA had two ADF's on board the aircraft which could have been pointed to this station —could have been tuned to this station, and the pilot would, therefore, have gotten two needle reversals, and the aural

or visual signal on the marker beacon receiver.

Before the pilot could have let down, according to all of the witnesses on both sides who were airline captains, and defense counsel as well, who admitted it when he summed up to the jury, he was required to receive a signal from *both* of those facilities, both the marker beacon transmitter and the ILS compass locator transmitter. Without receiving an indication from both, he could not have let down.

And there is no testimony anywhere in the record that there is any place in this area, other than directly over that facility at the west end of the San Mateo bridge, that he could possibly have received *both* of those signals.

### III. *How Far From the ILS Outer Marker Could Its Signals Be Received?*

The distance between the crash site and the ILS outer marker, at the west end of San Mateo bridge is about 10½ miles.

Defendants called Captain Warren L. Smith,[6] Chief Flight Instructor, Pacific sector, for Pan-American World Airways. He said he had made "thousands" of instrument let-downs in the San Francisco area, (T. 1487), and testified as follows: (T. 1405)

"The Court: Is there any testimony anyone ever got the ILS outer marker except where it is supposed to be? My understanding is there is no evidence in this case and none offered.

"Mr. Magner: In connection with that point, I might ask the witness

over what size area you would receive the ILS outer marker, at, say, 3000 feet?

"The Witness: It would depend on what position you had your mode selector in, whether it is high or low.

"By Mr. Gerry:

"Q. Take first for high and then low?

"A. Low at 3000 feet you wouldn't pick it up more than possibly a half mile off, and if you had it in high you could probably pick it up in a matter of a mile and a half, two miles.

"Q. On either side?

"A. Yes. The mode selection is the deciding factor."

Defendants argue that this testimony was in an offer of proof and cannot be considered by the court.

To a large extent this case was tried twice, once before the court, out of the presence of the jury, and then, before the jury.

The expert witnesses were examined on *voir dire* to determine the admissibility of their testimony. And, in connection therewith offers of proof were made. In accordance with his practice, the court ruled that the offers be made by calling the witness to the stand where he was sworn, examined and cross-examined, out of the presence of the jury.

The foregoing testimony of Captain Smith came in on such an offer of proof by defendants' counsel, Mr. Magner. The offer covered several subjects. And, at

---

6. (T. 1483–1487) His 35 years in aviation include: reserve pilot on first airmail run out of Los Angeles; had a hand in building the "Spirit of St. Louis"; "bush" flying in northwestern part of Canada and Alaska; from 1935–39 chief pilot Speers Flying Service, San Diego; from 1939–43 trained army cadets during the war, at Santa Maria Base, California; was chief pilot of that base; from 1943 to present employed by Pan-American; chief flight instructor for past eight years with 10 instructors under him; job is all types of general flight training, and proficiency checking of Pan-American pilots in New York, Honolulu, San Francisco, Tokyo, and Hong Kong. His ratings are single and multi-engine land with an ATR, commercial privileges, instructor's rating, engineer, airplane mechanic, and 3rd class telephone license. Qualified to instruct in DC–4, DC–6, DC–7, Boeing 377 and 707 jets. Been flying in San Francisco area 17½ years, 5½ days a week; has made "thousands" of instrument letdowns in San Francisco area.

the end thereof plaintiffs' counsel made his objection which follows: (T. 1407–8)

"Mr. Gerry: I would, at this time, your Honor, object to the introduction of this evidence *relative to the Salinas range leg and the Half Moon Bay fan marker* on the grounds that it is incompetent, to prove any issues in this case, irrelevant, immaterial, no foundation laid, indefinite and uncertain as to time, place and circumstances." (Emphasis supplied).

"The Court: The objection is sustained."

The objection Mr. Gerry made, and which the court sustained, was *not* to the introduction of the witness's testimony on page 1405 of the transcript, about the area in which the ILS outer marker signal could be received. That was not objected to, and was not excluded by the court. Mr. Gerry's objection was limited to the introduction of evidence "relative to the Salinas range leg and the Half Moon Bay fan marker." Obviously, there were other portions of Captain Smith's testimony to which plaintiffs had no objection, because Smith flew over the area of the crash between 9 and 9:30 the morning of October 29, 1953 (T. 1487), and plaintiffs developed from him part of their own case.

After the proceedings in chambers, the jury was called in, and Captain Smith took the stand and was examined again. (T. 1483)

Defense counsel examined him: (T. 1492–3)

"Q. Will you tell us the effect of the high and the low position when used by a pilot on the marker beacon receiver and the lights being operated by the marker beacon receiver?

"A. The function of the light is the same in either case, whether it is on low or high mode. The only difference is—if you are flying cross country and flying high altitude, a high mode is selected for that type of work. It enables you to pick up the marker in a larger area.

"In the low mode, you generally use it—at least it is used by us—on final approaches where you want more accuracy."

The CAB investigated the accident and found the marker beacon receiver "hi-low switch" was in the "hi" position. (CAB Investigation Report).

Defense counsel were given an opportunity to question Smith before the jury on the subject of the offer of proof, but chose not to do so.

The Court of Appeals for the Second Circuit has held, pursuant to Rule 43(c) of the Federal Rules of Civil Procedure, that the court may consider an offer of proof even though it is excluded. F. H. McGraw & Co. v. Milcor Steel Co. (2 Cir., 1945), 149 F.2d 301, 305.

Captain Smith's testimony, above, is before the court for his decision of a question of law: whether to direct the verdict for plaintiffs, or grant them a judgment *non obstante veredicto*. If the case should not have been submitted to the jury in the first place, what difference does it make whether Smith's testimony was taken out of the presence of the jury? He was sworn, examined and cross-examined before the court. The court asked for this information. Defense counsel examined the witness on it, and offered this matter in proof, by his *own* witness. The proof was offered by the defendants as the *fact* in the case through a highly competent and experienced witness, whom they may not, in any event, impeach. They have vouched for the truth of his statements and they are bound by them.

We do not have an attack upon the verdict on the ground, merely, that the jury had made a mistake on the evidence. We have an attack upon the verdict on the ground that the trial judge made a mistake in leaving it to the jury at all.

Neither is this a case where the proof was developed by plaintiffs' counsel on cross-examination which was outside the scope of the direct. The defendants opened wide the area covered by the cross.

Captain Smith's testimony, above, is not the only evidence in this case that the pilot of the BCPA plane could not have received the ILS outer marker signals in the vicinity where he crashed.

(1) Captain Brand testified that the BCPA plane "could not have been in the ILS approach *or pattern*, if it was up in the area of the Sierra Morena, at the crash site." And, this stands uncontradicted.

(2) Captain Lucas, cross-examination:

"Question: He has to establish that he passed *over it* by the reversals, and they are not going to reverse until he *passes over it?*

"Witness: As you *pass directly overhead."*

(3) Captain Smith, cross-examination:

"Question: Now, the fact of the matter is that you have never in your vast experience in this area picked up that ILS outer marker at any place but where it is, have you?

"Witness: *Not the marker itself, no."*

(This is the Captain who had made "thousands" of instrument let-downs in the San Francisco area).

(4) There is an illuminating colloquy between the court and defense counsel at (SLT 117–118 and 122–124):

"The Court: But he couldn't get the other unless he is over that ILS outer marker.

"Mr. Magner: He couldn't get— you mean the blue light?

"The Court: The blue light.

"Mr. Magner: *Not probably.*

"The Court: Well, 'not'.

"Mr. Magner: Well, there was other testimony as to that, that at a heterodyne frequency of the proper audio value it would light the blue light. And I was the first to say that it was *not probable.* But if we are going to talk about possibilities, it is possible, and the heterodyne is usually stronger than a modulation signal."

Again at page 119:

"Mr. Magner: We are talking about this case, and I say it is *a small possibility,* but there was testimony in my recollection that a heterodyne of that frequency will light the light."

Again, at page 121:

"Mr. Magner: I have said that it can be received *in an area* rather than at a point.

"Mr. Belli: Is it your contention now that you could pick it up at King's Mountain?

"Mr. Magner: *He wouldn't even want to pick it up at King's Mountain.*

"Mr. Gerry: Do you agree with Captain Smith that it would be a mile, a mile and a half or two miles with the marker set at high mode?

"Mr. Magner: *I would say in that radius.*

"Mr. Gerry: So we agree.

"Mr. Magner: That would be in conformity with the testimony I heard.

"Mr. Gerry: All right, that is a place to start from right there."

With respect to what Mr. Magner, in the foregoing, says: "There was other testimony that at a heterodyne frequency of the proper audio value it would light the blue light," the record is found at (T 1597–1608).

Counsel said he was not going to pursue it; he was not going to contend a heterodyne beat can light up that blue light; he was not going to argue that; he was not contending anything for the heterodyne beat business. And, the court excluded the evidence.

"The Court: What do you claim for it?

"Mr. Magner: *We will never argue a heterodyne beat will give a repeated signal, because it does not, such as a marker beacon flasher or marker beacon aural tone, because it doesn't, because it is a steady tone.*

We have no intention of arguing a ridiculous proposition when the fact is it is a steady tone, and I think we have had testimony to that.

"The Court: What is the color? Do you light up a light with a heterodyne beat?

"Mr. Magner: Mr. Crosby could tell better, but I think I am right in saying it would light up a light if that happens to be the one frequency that will light the light. In other words, if a 400-cycle note came through—I am being very frank about this—if a 400-cycle note came through it would light a light.

"The Court: A blue one?

"Mr. Magner: If it were a blue one.

"The Court: Do we have any evidence of that?

"Mr. Gerry: No, we have no evidence from anybody it ever happened here.

"Mr. Magner: Your Honor asked me if it would light a blue light, *and I say that is the only condition that I know of that it would light a blue light.*

"The Court: That is wholly theoretical, isn't it, Mr. Magner?

"Mr. Magner: *It is a tenuous thing. In other words, he is saying—I would not want to argue that the one heterodyne which would produce a blue light produced it at that moment. I think that I would feel that this was a tenuous argument.* But I am frank in saying that a heterodyne can under one condition light a blue light, and I think that is what you are asking.

"Mr. Crosby, you have heard this discussion. Is it possible for that heterodyne beat to light up a blue light?

"The Witness: May I comment first?

"The Court: Surely.

"The Witness: The attorney used a good word. *He said 'tenuous.'* And the answer is it could light a blue light, but *this is a tenuous argument.*

"The Court: *Have you ever seen it do it?*

"The Witness: *No, sir, I have not.*

"The Court: *It is wholly theoretical?*

"The Witness: *Yes, it is, sir.*

"The Court: Thank you.

"Mr. Magner: I had not proposed to get into that, your Honor.

"The Court: Well, we are in it.

"Mr. Magner: I do not believe I got into it. My purpose here was to explain the operation.

"The Court: You go into it when you got into the heterodyne beat. I will hear from you, Mr. Magner. I am tentatively thinking about sustaining the objection and granting the motion to strike. If you have anything further to say against that position, you may do so.

"Mr. Magner: Merely that a suggested argument that I had not advanced that a heterodyne beat would light a blue light was not part of the reason he was called.

"The Court: If there is any facility anywhere else in this vicinity, or any combination of facilities, that would produce that kind of signal out there at the Half Moon Bay area in this vicinity which might have misled him, and which might have confused him and brought him down into that cloud layer at the wrong place, that I think is very material and relevant and ought to come in here, and I have been listening for it.

"Now, if your purpose here is to suggest from this testimony of Mr. Crosby that that signal could have been received out there over the Half Moom Bay area, then we are going to have to look into it.

"Mr. Magner: This testimony is designed to show this is an area, and an area that varies with altitude.

"The Court: This testimony is theoretical.

"Mr. Magner: There is nothing theoretical about the area of radiation of these transmitters.

"The Court: I am talking about lighting up that blue light with a heterodyne beat. That is the only thing I am addressing myself to.

"Mr. Magner: I did not mention 400 cycles in my testimony. Somebody else brought that out.

"The Court: You are going to pursue it, aren't you? Isn't that your idea?

"Mr. Magner: No, sir.

"The Court: You are going to contend a heterodyne beat can light up that blue light, aren't you?

"Mr. Magner: No.

"The Court: You are not going to argue that?

"Mr. Magner: No, sir.

"The Court: Then we won't talk about that any more.

"Mr. Gerry: Is it going to be a contention that the heterodyne beat could be mistaken for a continuous series of dashes?

"Mr. Magner: I just said, I think a few minutes ago, that a heterodyne beat is steady, and it is not given in a series of blips or bursts. Now, that is my knowledge. You may want to ask Mr. Crosby about that.

"Mr. Gerry: No.

"Mr. Magner: I think it is pretty generally known the heterodyne beat is a steady signal.

"The Court: I think you are entitled to show, Mr. Magner, how these cones from the radio facility come up, and that is what Mr. Crosby was doing the other day. I think that is certainly admissible.

"Now, you have solved the heterodyne beat business. He isn't going to contend anything for it.

"Mr. Gerry: Then why put it in, except for confusion?

"Mr. Magner: I mentioned 200. I did not say anything about 400.

"The Court: I am correct in what I said. You are not contending anything for the heterodyne beat business?

"Mr. Magner: That's right.

"The Court: All right, then that goes out. You make no contention for it, and that evidence goes out."

So, defense counsel gave up this reason for believing the blue-purple light of the ILS outer marker could be received anywhere near the vicinity of the crash site.

There was one other small suggestion which turned out to be no more than a pretense of proof. This is discussed at length in Appendix B, pp. 32–38. In short, the court had asked defense counsel Parker upon what facts he relied for moving a proposed overlay down on the chart, to which he replied: "Mr. Parker: We have evidence in this record that if there was mis-keying that you would get the outer marker signal at the Half Moon Bay marker. That is one test." (T. 1285)

To which Mr. Gerry replied that he would like to read what Mr. Parker was talking about, because it is a very good example, as indeed it is, of the "Comment" under Rule 303, American Law Institute Model Code of Evidence. Gerry says: "This is the evidence, your Honor, my questions on cross-examination of Captain Lucas: (T. 1063)

" 'Q. Just so we are clear, this fan marker never lights a blue light, does it?

" 'A. Not to my knowledge, it shouldn't.

" 'Q. This fan marker never gives a consistent series—a continuous series of dashes, does it?

" 'A. A continuous series of dashes?

" 'Q. It gives da da da da da da?

" 'A. If there was any mis-keying, there would be a continuous series, if.

" 'Q. You never heard it.

" 'A. I never heard the Half Moon Bay marker give a continuous series of dashes.'

"THE COURT: Is that all that was said about mis-keying?

"MR. GERRY: That's correct.

"MR. PARKER: That's all.

"THE COURT: You say there is evidence of mis-keying?

"MR. PARKER: No, I didn't say there was evidence of mis-keying, if the court please. I said there was evidence that if there was mis-keying that Half Moon Bay fan marker would give a continuous series of dashes.

"MR. GERRY: But there is no such evidence."

The only evidence about this in the record is summarized in this opinion, VII, sub-paragraphs (1), (12), (14), and (15). There had not been any failure of the Half Moon Bay fan marker equipment *in the keying or in the signal* for at least a whole week. The testimony in the record is, if it misfunctions at all, it switches over to the standby equipment automatically, and, it had not switched over. It was flight checked and ground checked right after the accident and found functioning normally. A United Airlines flight came in from Honolulu over the Half Moon Bay fan marker 10 minutes before this aircraft. Everything was normal. There was a plane that flew out to Honolulu over the Half Moon Bay fan marker 15 minutes after the crash. Everything was normal. All of the records show everything was normal. There was *no* evidence of mis-keying, whatsoever. On the contrary, Lucas, when asked "This fan marker never lights a blue light, does it?", replied: "Not to my knowledge. It shouldn't." And, when Lucas was asked, "you never heard it", he replied: "I never heard the Half Moon Bay fan marker give a continuous series of dashes."

And, Mr. Gerry says: "That is the evidence on mis-keying, your Honor."

Even Parker (T. 1328) backs away from it: "The Court: You say there is evidence of mis-keying? "Mr. Parker: No, I didn't say there was evidence of mis-keying, if the court please."

So, there is absolutely *no* evidence whatsoever that the Half Moon Bay fan marker ever gave a continuous series of dashes.

(5) There is further discussion about the pattern and objective of the marker beacon transmitter under "II", above, page 295.

This reflects testimony from both Captain Brand and Mr. Crosby. Brand said the ILS outer marker is "a smaller radiation of signal than the Half Moon Bay fan marker would be, because it has *narrower limits*. It is more *precise*. And, it has to cover a smaller area". (T 440) The area of receptivity of the Half Moon Bay fan marker, on the minor axis, which is the course an aircraft flies coming in from the ocean, is 3 to 4 miles, (Brand and Campbell).

The objective in the design of the equipment is to provide a location in space over a point on the ground so that the pilot may, when he is over the place, know *precisely* when he is there. "It will light a light where you want it, which is the *point* you are trying to mark." (T. 911, witness Crosby).

(6) Defense witness Robert C. Crosby, further testified, that the 75 megacycle marker beacon transmitter makes a pattern which is generally upward as shown on the chart, but it has "minor" amounts of signal going outward. (T 915–919). There are certain radio waves, that the antenna does not quite successfully put into the upward pattern, but they go out a little to the sides.

There are certain filters in the marker beacon receiver equipment in the aircraft. The purpose of these filters is to filter out all the signals except the one you want to get. This is what they are there for. Their purpose is so that *if you pass over* the outer marker you get the signal *radiated up from the outer marker* which is

permitted through, and the others are filtered out.

They also apply a different modulation frequency to the signal. And that is why the outer marker lights only the blue light, the middle marker the amber, and the fan markers light the white one, because of the modulation frequency.

Also there are two sensitivity input adjustments. The purpose of the input sensitivity adjustments is that you will only pick up the signal when it is of a certain intensity. And the purpose of the input sensitivity adjustments also is to cut down on the possibility of picking up these other waves that are not bent up into the pattern. These signals that are bent in an upward direction and sent up in a pattern—are sent up at a greater intensity than the few rays that sneak out around the sides.

(7) The clearances to the BCPA pilot import a narrow and precise geographical location:

> At 0827, "ATC clears VHBPE to the San Francisco outer marker via the Half Moon Bay fan marker direct to the San Francisco ILS outer marker."

> At 0839, * * * "*cross the outer marker* initial(ly) at least five hundred on top."

The controller in the approach control position at the San Francisco International Airport, and who was in communication with the BCPA plane the morning of the crash (Mr. Stone) explained the clearance, and emphasized the import:

> " 'Cross the outer marker initial(ly) at least five hundred on top' means for the aircraft pilot to *proceed over the outer marker compass locator,* which is a marker of the ILS system. "At 'initial altitude' means to *pass over there initially at this point over the outer marker* at least 500 feet on top of the cloud condition."

> "Q. Now, with an ILS approach clearance, does this clearance to the BCPA flight permit the flight to de-

scend into the clouds before it *reaches the ILS outer marker?*

"A. No. *Not before it reaches the outer marker, initially, no.*"

"Q. He would have *to pass over the outer marker, correct?*

"A. Yes.

"Q. Now, *after making that pass over the outer marker,* then would be the time that he would be northeast of the outer marker?

"*After the initial pass over the outer marker,* where would he be?

"A. Northeast."

(8) The Instrument Approach Chart— LOM "Appendix 'A' ", drawn to scale, shows the little elipse marked "OM continuous dashes." The radius shown on its major axis is between a mile and a half and two miles, which is Smith's testimony.

(9) If defense counsel in this case have any knowledge that the ILS outer marker signals are *not* confined in an area pretty close to its geographical location at the west end of San Mateo bridge, they haven't communicated that information either to us or to the industry. Captains Smith and Lucas, Brand and Campbell, apparently haven't heard about it. Neither have the San Francisco International Airport communications people, nor Mr. Lucas, the electronics expert from Massachusetts. Counsel, three of whom are pilots, who put the questions to the witnesses seem often to have forgotten about it.

Time and time again in this record, is clear language of reference to the narrow and precise geographical location of the ILS outer marker signals.

Captain Smith, cross-examination by Mr. Gerry, (T. 1503–5):

"Q. Captain, under the clearance which I read you that this pilot had on October 29, 1953, could he, without violating the clearance given him by the tower, descend into the clouds *before passing over the ILS outer marker?*

"A. No."

RECROSS EXAMINATION BY MR. GERRY:

"Q. Just so we are clear on that, Captain, the signals that he would get *on going over the outer marker* would be the aural signal da da da da da—a continuous series of dashes?

"A. Yes.

"Q. At the same time, he would get the blue light flashing, da da da da da da?

"A. That's right.

"Q. At the same time, if he would have his two ADFs tuned to the station—according to Captain Lucas, that is their custom and practice?

"A. That's right.

"Q. And *as he passed over the station*, the needle would waver somewhat and then reverse and point behind him?

"A. *If he passed over the station*, that is correct.

"Q. It would point directly ahead or to what would be zero on the dial *as he was headed toward the station?*

"A. That's right.

"Q. And *as he got over the station*, it would waver back and forth a little bit?

"A. That's right.

"Q. And then would gradually, within a couple of seconds, turn around and point behind him or at 180?

"A. That's right."

Witness John Campbell, chief of the Flight Inspection Branch of the CAA, now FAA, on October 29, 1953, date of the accident checked all of the components of the ILS system. He testified:

"Q. Where are the compass locators?

"A. The compass locators are placed, normally, at 3500 feet and five and a half miles from the end of the runway to define a *certain point in the approach area.*

"Q. If you *pass over that facility*, what happens to the pointer?

"A. The pointer reverses itself 180 degrees and points backward.

"Q. The indication in passing over these facilities, you have an audio and also a light that lights on the dash of the instrument panel of the aircraft.

"Q. Is there any difference in color between the lights that you pick up *passing over these?*

"A. Yes. The outer marker is purple.

"Q. In 1953, what audio signal did you get when you *passed over the San Francisco ILS outer marker?*

"A. The outer marker is a series of dashes.

"Q. If you were coming from the coast, and you maintain your heading in *until passing over to the outer marker*, what indications would you have on your two ADF dials *as you passed the outer marker?*

"A. In *passing over the outer marker* the pointer would reverse.

"Q. Then if you made a turn *after passing over the compass locator*, in which direction would your pointers point?

"A. They would point to the rear.

"Q. Both?

"A. Both."

Defendants Offer of Proof
On False Compass
Reversals On
The ADF

The defendants made an offer of proof, through Captain Warren L. Smith, touching the subject of false compass reversals on the ADF. This appears in the transcript in four places: (1) pages 681–698, (2) pages 1254–1275, (3) pages 1376–1415, and, (4) pages 1483–1507.

Captain Smith testified that the ADF can give a false overhead. (T. 686). It indicates in the same manner it actually would going over the station. He testi-

fied that it had happened to him in the San Francisco Bay area, on the northwest course of the San Francisco range, and on the northeast course of the Oakland range. That it had happened 4, 5, 6 times, but as to the number he was guessing.

## ON CROSS-EXAMINATION:

(1) The witness said he had never had that experience on the *southwest* leg of the San Francisco low frequency range. And, he could not tell of his own knowledge whether that phenomenon has occurred on that leg. He had never had the experience of the ADF reversal on that leg.

The southwest leg of the San Francisco low frequency radio range station, is the course the BCPA pilot should have been on, the morning of the accident, as he came in from the ocean to Half Moon Bay.

(2) The witness said, also, there was a "Z" marker at the San Francisco radio range, at the time of the accident. And, if the range has a "Z" marker, it doesn't tend to confuse you a bit. There are methods of proof, should you receive a false overhead and the sole purpose of giving those to a pilot in training is to induce him to make a secondary check before he accepted it. We train our pilots to take care of the situation. So, if a pilot got one of those, when flying the southwest leg of the San Francisco radio range, knowing there was a "Z" marker there, he would not be confused. He wouldn't get his light, unless he was over the station, and he wouldn't get the "Z" marker tone. So, he wouldn't be confused. Not if he were flying the leg over the station. And, not if he knew everything pertinent there was to know about this area. (Which BCPA admitted their Captain did).

(3) Captain Smith testified: When you pass over a marker, or come to a marker, before you go into a different pattern, you would have to be certain that you identified it both by the aural and visual signals.

(4) Cross-examination:

"Q. You don't receive those on your ADF going into the outer marker, do you?

"A. That I never in my own experience had happen in that immediate vicinity. (T. 691)

"Q. And that was talking about ADF reversals going into the outer marker. So that we are not confused here, you have not had that experience when tuned to the outer marker, have you?

"A. It was my contention that you had reference based on this approach that you are talking about. In that area, no, I have not.

"Q. Fine, just so we know where we are."

(5) The witness received the false reversal of the ADF needle on the northwest course, and on the northeast course over the Oakland hills—in all, 4, 5, 6 times.

"Q. How many times do you think you have flown those two courses?

"A. Thousands."

(6) One of the things that will give a false reversal is improper tuning of your instrument. When he checked, sometimes it was properly tuned, and sometimes it was not. About half of these, 4, 5, 6 times were caused by improper tuning.

(7) When asked if they happened in the area we are talking about, the witness said:

"A. I have not experienced any of that from the Half Moon Bay fan marker direct to the outer marker. It is not in our operating specifications, and I have not made that approach." (T. 1264)

(8) When asked, "did you ever have a situation where you had two ADFs on the same station and got a reversal on both of them at the same time?" the witness replied:

"A. Both ADFs on a station, no. I don't ever recall that." (T. 1265)

(9) On cross-examination:

"Q. Did you ever come into this area and pick up the northwest leg of the Salinas range four miles from its location, geographical location, on the chart, at the same time pick up the Half Moon Bay fan marker eight to ten miles from its geographical location on the chart, and at the same time get an ADF reversal, all three at the same time?

"A. No.

"Q. It is practically impossible, isn't it, in your experience?

"A. In my experience, yes." (T. 1275)

(10) On cross-examination:

"Q. You did not at that time get any signal on your marker beacon receiver set that would lead you to believe that you were over the middle marker, did you?

"A. No.

"Q. And you always do as Captain Lucas tells us that the captains of BCPA did, you always double check, don't you?

"A. Correct.

'Q. So that if you did get a momentary false reversal of your ADF, this did not lead you to think you were over the middle marker at all, did it?

"A. Not without the double check on the facility, the fan marker.

"Q. And did you have one ADF tuned to the station or two?

"A. In this particular instance, one ADF on the outer marker. This was a VFR flight coming over the hills. (T 1379)

"Q. You got a momentary reversal and back?

"A. Just about 10 seconds and back.

"Q. And no blue lights?

"A. No.

"Q. And no continuous series of dashes?

"A. No.

"Q. You never had an experience in that area where you had both ADFs tuned, and they both reversed on you, did you?

"A. You are speaking of that immediate area where I experienced these separately?

"Q. Yes.

"A. No.

(11) The court asked the witness:

"THE COURT: What we are talking about are false reversals of the radio compass; is that right?

"THE WITNESS: That is correct.

"THE COURT: How does that mislead you? (T 1380)

"THE WITNESS: If you had one radio facility, which is a compass locator itself, and the letdown was predicated on that installation only, there is a possibility of being misled by a false reversal. If you have more than one aid, of course, as Captain Lucas said, you have to check both of them. There are still areas that we fly that we have one ADF to make our instrument approach with.

"BY MR. GERRY:

"Q. But that isn't this area, is it?

"A. No; I said we have other areas.

"Q. So that in this area that we are talking about, you are not going to be misled by that, are you?

"A. Not if you have two facilities and things are working.

"Q. Not if you have two ADFs pointing to the station, and your marker beacon receivers, and lights, it is not going to mislead a pilot who knows everything about the area, as BCPA admits their pilots knew; it is not going to mislead a pilot who made 118 approaches in there, is it?

"A. As I said before, if all the components, airborne and on the ground, are working, no. (T 1381)

"Q. Do you know whether at the time you got that false reversal, or those false reversals, the components on the ground were working?

"A. Yes, they were working.

"Q. Do you know whether or not there might have been a momentary something that happened to them?

"A. No, I wouldn't have that knowledge, no.

"Q. So it is impossible then for us to state whether the conditions were the same at that time as they were at the time of the accident, isn't it, without going through all these records?

"A. You mean—

"Q. Whether the ground components were the same.

"A. Well, we assume they are the same at all times, yes.

"Q. But it is an assumption we have to make?

"A. That's right." (T 1382)

"MR. GERRY: I object, your Honor, on the grounds that this evidence is incompetent, irrelevant, immaterial, too remote, no foundation laid as to circumstances, times and places.

"THE COURT: The objection is sustained." (T 1383)

The objection was sustained to this and other offers of proof by the defendants upon the authority of Judge Learned Hand's opinion in United States v. Krulewitch, (2 Cir., 1944) 145 F.2d 76, 80, 156 A.L.R. 337:

"* * * yet, here as always, the competence of evidence in the end depends upon whether it is likely, all things considered, to advance the search for the truth; and that does not inevitably follow from the fact that it is rationally relevant. As has been said over and over again, the question is always whether what it will contribute rationally to a solution is more than matched by its possibilities of confusion and surprise, by the length of time and the expense it will involve, and by the chance that it will divert the jury from the facts which should control their verdict." Wigmore Sec. 39(2).

■ The probative value of this evidence is outweighed by the risk that its admission will (a) necessitate undue consumption of time, and, (b) create substantial danger of undue prejudice and of confusing the issues and of misleading the jury. Rule 303, American Law Institute Model Code of Evidence, pages 180–182.

## IV. Approach From Ocean to Half Moon Bay.

Starting at the point where the flight was released from its corridor assignment, 70 or 75 miles out, the pilot would tune to the low frequency radio range station, located at what is marked on the chart as San Francisco Radio range. By tuning his ADF to 227 kilocycles—that is the frequency of the San Francisco low frequency radio range—he would be able to identify the range station. And, he would be able to determine whether he was in the "A" or the "N" quadrant. When he is on the on-course of the southwestern leg of the San Francisco low frequency radio range, he would hear a continuous on-course signal for a period of 30 seconds, and then followed by the identification signal of the range station repeated. Proceeding from the release point and using the low frequency range leg as a guide, he would know when he was on a heading of 020.

Should he get one side or the other of the range leg and not be on the on-course, he will receive a signal. In this particular case, if he were to the northerly side of the southwestern leg of the San Francisco low frequency range, he would receive an "A" signal; it would be an "A" in Morse Code, i. e., "dit da". And, on the southerly side he would receive an "N" signal, in Morse Code, which would be "da dit".

If a pilot, coming in from the ocean, were flying on top of the clouds and could not see the ground, Captain Lucas tells us how he would find the Half Moon Bay intersection (T. 988–990):

"Witness: He would have one of his automatic direction finding receivers

tuned into the San Francisco low-frequency range. He would be listening to the audio signal from the range. It will show he is maintaining himself on course on the southwestern leg. And also, at the same time, he would be continuously monitoring—his co-pilot might help him in this duty of continuously monitoring—the Salinas radio range so that when he also received the steady signal, the on-course of the northwestern leg of the Salinas range, he would then fix himself by his radio over the Half Moon Bay intersection.

"Question: You mentioned his co-pilot might help him. It is mandatory that he receive the signals if he is captain; is that correct?

"Witness: Yes, he would be listening to the signals himself. It would be his responsibility to fix himself at that position.

"Question: Normally, over how long a geographical area would he receive the on-course of the Salinas range? How far either toward the San Francisco radio station or away from the San Francisco radio station, from the little pyramid indicating the Half Moon Bay intersection?

"Witness: It could vary a couple of miles either side of the Half Moon Bay intersection; just depending on the reception on that day."

### V. The Half Moon Bay Fan Marker Signals.

Captain Brand's [7] testimony was: (T. 803–812) "At the time you came over the Half Moon Bay intersection or fan marker, you would report that you were over the Half Moon Bay. In this particular case, the gentleman making the position report said 'Half Moon Bay'. So, he

reported over that position on a heading towards the station, and reported to the San Francisco tower itself at that time, that he was at that intersection." (about a mile further out, offshore, than the Half Moon Bay fan marker).

"Question: How does he tell when he is over Half Moon Bay fan marker?

"Witness: As he gets over the Half Moon Bay fan marker the marker beacon receiver, which is on whenever the radio switch is on, will light up the *white* light and he will see the light on the instrument panel which is directly in front of him, and he will also hear the tone, the identifying keying system, in his earphones, and they will be synchronized or they will be seen and heard together.

"Question: What is the tone and signal in this area?

"Witness: The identifying tone or signal, which ever you want to call it, or the combination of the two, was *three dashes, and a short pause, and then three dashes again*. So you would hear this and see it as you came over the Half Moon Bay fan marker.

"As you would be coming in in a northeasterly direction, a northeasterly heading, as you came in the signal area, which would be the limits that the antenna emitted the signal in, you would begin to hear it faintly, then louder, and then still louder, and, at the same time, your marker light would first flash softly, and then—not softly—in low intensity, and then the closer you came to the center of it, until over the very center of it, it would get stronger and stronger; and then, after you.

**7.** Captain Walter C. Brand had flown since 1939—for 22 years. Four years in the United States Navy in seaplanes, multi-engine sea planes, four engine land planes, four engine bombers—all kind of navy multi-engine equipment. Since 1948 actively employed as airline pilot. Has airline transport rating; single and multi-engine seaplane rating; single and multi-

engine land plane rating; aircraft and power plant mechanic's license rating; flight navigator's rating; two of the radio-telephone third class licenses. Has over 13,500 hours in the air. Flown in the San Francisco area, the United States, the Far East, the Middle East, in Europe, the North Atlantic and the Pacific.

passed over the center, it would begin to decrease in intensity, both in light and sound, until you went past it, and it would gradually fade out to nothing again.

"Question: How would he tell when he was at the Half Moon Bay intersection?

"Witness: At the Half Moon Bay intersection there was a radio range coming from Salinas, approximately 120 miles southeasterly, which would give him a cross bearing or a reference point which, when he was tuned to that station, he could get an on-course or a continuous tone from that radio frequency range at Salinas that would tell him that he was passing over the intersection at Half Moon Bay.

"Now, I would also like to mention that there is another radio receiver he could be using which was his BC348, there is a low-frequency band in that, so between the combination of the two ADFs and the low-frequency band of the BC348 he would have sufficient radio to give him adequate receiving facilities to cross check and use each one individually and still be able to positively identify his position.

"Question: Could he, under the company regulation that we talked about, as I read to you, the regulation about leaving that area (Exh. 66), start his next leg of the journey into the ILS outer marker without a positive identification of those radio signals?

"Witness: No, he couldn't.

"Question: After he leaves that Half Moon Bay area on this approved approach, what then is his flight path from there and what is his next fix?

"Witness: His flight path would be directly from the Half Moon Bay fan marker or intersection directly on a heading of 034 degrees, with a small—it could be a small correction for wind allowance, to the ILS outer marker compass locator.

"Question: How does he find his way there with that blanket of clouds over that area that you just showed us? How does he find his way to that other fix, the ILS outer marker?

"Witness: Well, at the Half Moon Bay intersection or fan marker he would re-tune both of his ADFs, or only one, if need be—I might say would re-tune both of them—to the frequency of the ILS compass locator outer marker, positively identify it, in the tuning device which they have.

"Question: How would you identify it?

"Witness: They have a coding signal which, when you tune to the correct frequency, in this case it was 350 kilocycles, they have a Morse code signal, and in this particular case it is S.F. That would be three dots, a pause, then two dots, a dash and a dot, which would be the identifying signal which you would positively have to tune for to make sure you were on the correct frequency. Then after you identified it, you would put it on the automatic direction finding position, and then the needle would point directly to the ILS outer marker compass locator at this point (indicating).

"Question: Then would you also use your watch in making this approach?

"Witness: Well, when you reported over the Half Moon Bay fan marker, or intersection, to the tower, you would—normally give—a time. In this case, it was 39.

"Question: What does "PTA" mean? Is that a sort of check list you have?

"Witness: PTA?

"Question: Position, time and altitude.

"Witness: Yes, yes. The normal terminology at intersection is to give a sequence of events or a form which the receiving station will be able to follow, and it is usually referred to as PTA, position, time

and altitude. So you would say: Half Moon Bay, 39, in this particular case, at least 500 feet on top.

"Question: What altitude would you maintain between Half Moon Bay and ILS outer marker under the clearance given this day?

"Witness: The minimum en route altitude between those two points is 3,500 feet, so you would have to maintain at least 3,500 feet or, if the clouds were higher, you would have to maintain 500 feet, at least 500 feet, on top of these clouds.

"Question: Now, when you got to the ILS outer marker, assuming that you did go, how would you identify it?

"Witness: As you approached the ILS outer marker, you would have your needles pointing to the station. As you progressed and went over it, they would point from a direction ahead to a direction behind you. At the same time you would hear the signal of continuous dashes, and you would see the blue light on your marker beacon signal in front of you begin to flash.

"Question: What would the signal be?

"Witness: Continuous dashes. And simultaneously with each light you would hear the signal in your earphone.

"Question: What other indication would you get?

"Witness: They also had the localizer needle, which is a VHF radio system which is called—it is one of the two components of the instrument landing system. Your needle would swing from the left to the right, or right to left, whichever the case would be, depending upon the direction you were going to. So you would be *crossing it*, your needle would swing, you hear your signal of the marker beacon in your ears, and you would see the light, and you would also have your localizer needle swing from one side to another.

"Question: Then after you pass through that, passed over that, could you go on without positively identifying that fix; could you go into the next phase of this approach?

"Witness: Those four items for you to check would be your positive fix so you would know you *were over the ILS outer marker.*

"Question: But if you did not know, you could go on to your next approach, your next segment, if you couldn't identify the marker, could you not?

"Witness: You mean if your fan marker wasn't working?

"Question: If you missed it, or if you couldn't find it.

"Witness: You would remain at least 500 feet on top of all clouds until you were sure of yourself; or, if the component was not working and you thought it was inoperative, you could call the tower for further instructions and ask them if their unit, in this case the marker beacon —oh, I am sorry, the compass locator, and ILS outer marker—you would call the tower and ask them if it was in operation, and they could check the monitor, and if it was in operation they would tell you it would be within tolerances, or something similar to that, and say it is normal and operating, and then you would know, if that were the case, that you had not passed over it.

"Question: Under the approach that was approved for this pilot this day, what would be the next procedure normally to be followed after passing over and positively identifying the ILS outer marker?

"Witness: May I look at that chart, please?

"Question: Certainly.

"Witness: This is chart ALP75-ADF.

This would show that as you went over it from this area you would proceed and turn to the right southerly to get in an outbound or in a position away from the airport, so if you were coming in this direction you would make a turn to the right so as to go back across what we call the outbound heading, and in this case it would be 101 degrees, then proceed outwardly and make a procedure turn, or a tear-drop reversal, whichever you would like to do, so as to come back, and then recross inbound the ILS outer marker in towards the station and the airport.

"Question: If you were told in that message, in that clearance to report, when inbound, where would you report on that approach?

"Witness: That would be during your procedure turn, which would mean that you had turned down this way (indicating), and were proceeding in a southerly direction, and then as you started to make your turn reversal, or your procedure turn, you would call at that time turning inbound.

"Question: And then you would cross over the ILS outer marker again inbound, I take it?

"Witness: Yes, according to the flight path, after you had made your procedure turn you would proceed to the ILS outer marker and cross that inbound."

We have noted earlier in this opinion that the flight plan, filed by the crew in Honolulu with Air Route Traffic Control, indicated Sacramento, California as the alternate airport.

The estimated flying time was nine hours and twenty-five minutes, and, there was fuel on board for twelve hours and fifty-three minutes.

## VI. ILS Navigation from Half Moon Bay to ILS Outer Marker.

Captain Lucas [8] (T. 1013–1014) drew on the chart the flight path from the Half Moon Bay intersection *direct* to the ILS outer marker. "I have approached San Francisco many, many times under *a similar clearance* and on a similar day and these types of conditions. *I have also gone in with Captain Dickson* (pilot on flight which crashed) *on a similar day, and I would expect that the flight path that we would follow on that particular day* would be," (indicating).

"Question: You are indicating a path to the outer marker?

"Witness: *That is a path from the Half Moon Bay intersection to the ILS outer marker.*

"Question: And that goes *right about through the center of the Half Moon Bay fan marker* as it is indicated on this chart?

"Witness: That is correct."

Captain Lucas testified what the navigational procedures were in flying a direct line from either the Half Moon Bay intersection or fan marker to the ILS outer marker (T. 993–996):

"Witness: Having first of all established myself at either one of those two places, either the Half Moon Bay intersection or fan marker, I would normally tune in both radio compasses to the outer marker compass locator beacon.

"Question: And then how would you determine when you were in a position over the outer marker?

"Witness: By the overhead of the outer marker compass locator on the ADF needle, and also by the aural and the visual signal of the outer marker beacon.

8. Defendants brought this witness from Australia. Captain Richard D. Lucas was Captain with defendant BCPA in 1953. At time of trial he was senior check and training captain on Boeing 707 aircraft for Quantas Empire Airlines. Flown for 20 years. Made 200 approaches to San Francisco Airport. He was given the Distinguished Flying Cross by the Royal Air Force in 1944.

"Question: Now, you would have to have two checks before you started down through the clouds?

"Witness: That is correct.

"Question: At a point where you were receiving signals, you were at the San Francisco outer marker, would you not?

"Witness: That is correct, yes, we would have to double check our position before we started any descent down through the clouds.

"Question: And in 1953, what two checks would you use?

"Witness: We would use the outer marker compass locator, and the outer marker beacon, both, of course, situated here at this point we marked (indicating west end of San Mateo bridge).

"Witness: The outer marker compass locator is a non-directional beacon situated at the outer marker of the instrument landing system at San Francisco.

"Question: And how would you determine that you were *passing over that facility?*

"Witness: The ADF needle, which would be pointing straight ahead, or near enough to straight ahead, would make a reversal and indicate that.

"Question: And as you *passed over the outer marker*, what would happen to the needle?

"Witness: The needle would, instead of pointing in front of us, make a reversal and point behind us, indicating that *we had passed over it.*

"Question: What is the second check?

"Witness: The second check is a check to be made on the outer marker beacon. It is necessary to receive the aural, or the visual signal, of the outer marker beacon in addition to the overhead by the compass needle at the compass locator—either or both, yes, in addition to the overhead by the ADF needle.

"Question: This aural or visual signal, you receive that on what kind of an instrument?

"Witness: You receive that through our marker beacon receiver onto a light on the pilot dashboard, and also, the aural signal through the headphones."

On cross examination Captain Lucas was asked (T. 1140): "There is no dispute whatsoever, is there, that he could not let down into any clouds until after passing the ILS outer marker?

"Witness: He could not have let down in the clouds until *establishing himself over the ILS outer marker.*"

And, again, (T. 1142) Captain Lucas, on cross examination:

"Question: You got him turning immediately that he gets into this area, right?

"Witness: Immediately he received the overhead of the ILS outer marker.

"Question: He has to establish that he passed *over it* by the reversals, and they are not going to reverse until he *passes over it?*

"Witness: As you pass *directly overhead.*

"Question: When you pass *directly overhead,* they will be wavering?

"Witness: Yes.

"Question: And then you have to get by it and then turn around?

"Witness: Yes, a matter of seconds."

VII. *All Radio Aids to Navigation Were Functioning Normally.*

Contrary to the unjustified inferences that were drawn by defense counsel in argument, the facts elicited from the witnesses show all radio aids to navigation of aircraft in the San Francisco area were functioning normally on the day of the accident, October 29, 1953.

On account of this aircraft accident in the vicinity of Half Moon Bay, employees

of the federal aviation authority, at that time, the C.A.A., checked all of this equipment shortly after the crash on October 29, 1953, to make certain that it was functioning properly. The equipment was both flight checked and ground checked.

(1) The Half Moon Bay fan marker was operating properly on the day of this accident. It was both ground checked and flight checked after the crash. The ground check showed that from the time of the last check, October 22nd, there had not been any failure of the equipment in the keying or in the signal for at least a whole week. The equipment had not transferred from the primary equipment to the standby equipment. No power failure was indicated. The ground inspector found the facility normal. The patrol pilot on the flight check, also, on the 29th of October, reported the facility normal. (Exhibit 9).

(2) The Belmont fan marker was ground and flight checked on the 29th, after the aircraft was reported missing. Both found the facilities and operation normal. And that also goes back for one week.

(3) The San Francisco radio range. The entry on the document (Exhibit 13A) at 9:45 A.M. October 29th, shows the equipment "operating normal." It also was both ground and flight checked. Witness Mathews explained this exhibit.

(Defense attorney Parker read to the jury from this document. He omitted the 29th, the day of the accident. Instead read about the 4th of October and the 31st).

(4) The ILS (instrument landing system) outer marker, on October 29, 1953, at 10:25 A.M. (Exhibit 17) says: "Aircraft accident. Checked operation of equipment. Compass locator antenna current lower than normal. Normal 1.9, as found 1.2, damp conditions causes this normal drop in current."

This is called a "normal drop in current" because it would not affect the operation of the facility. But, would have the effect witness Mathews tells us (T.

p. 186), "the range would be, in my estimation, slightly reduced". By range is meant "the coverage of the propogated signal." It would have no other effect on the facilities.

The ILS outer marker also was flight checked on the 29th. "All components flight checked normal" (Exhibit 17A).

That is the ILS outer marker.

(5) ILS middle marker (Exhibit 10) shows it to be normal.

(6) The glide path, (Exhibit 23) is shown to be normal.

(7) The locator on the 29th at 9:25 A.M. was ground checked and there was nothing wrong. Witness Mathews explained they only make notations if there is something wrong. He says no discrepancies were reported.

(8) ILS Monitor. This is the monitoring system that was testified to, the alarm and the bell—the red light and the bell in the tower. On the 29th at 8:15 A.M. you find just check marks, which means it is normal according to witness Mathews. There are two checks each day.

(9) San Francisco low frequency radio range. Witness Campbell flew this after the accident. He testified he checked all four courses and no errors were found on any of them. When checked they were all four functioning. (T. p. 615).

(10) Witness Campbell also testified he was familiar with the various components of the instrument landing system. (T. p. 616). They are: "The localizer, the glide slope, the middle and outer locators, the middle and outer markers." He flight checked all of those components. "They were all operating normally and within tolerances."

(11) When Campbell flight checked the Belmont fan marker he found it functioning normally. (T. p. 620).

(12) He flight checked the Half Moon Bay fan marker and found it operating normally and within tolerances. (T. p. 620).

In answer to the question: "What would be the audio and visual indications to a pilot passing over that marker?

Witness: "It would be three dashes, both audio and visual, white light."

(13) Pescadero Low Frequency OMNI Range was flight checked by witness Campbell. The operation was normal.

(14) Finally, witness Campbell testified: (T. p. 622)

"Question: Did you in your flight check find any radio aids to navigation which were not functioning normally?

"Witness: No, we did not. Everything was normal."

Those are the facts as to these radio signals, that everything checked on the ground, everything checked through the monitors in the tower, and everything flight checked by CAA personnel checked out normally.

(15) Added to that is the fact that the United Airlines flight from Honolulu went in ten minutes before this aircraft, and it, too, found everything operating normally. (T. p. 105) The flight engineer on the United flight, witness Marion, testified they reached the blocks at the San Francisco International Airport at "eight forty two or three, along in there." The witness said their clearance also was "over the Half Moon Bay fan marker."

The United approach that morning "was a normal instrument approach to San Francisco, yes."

In answer to the question: "Now do you know roughly what time it was that you were over Half Moon Bay?" Marion answered: "Well, we landed at eight forty two or so. It would be instrument approach. Back about eight twenty five, eight thirty, around there." At a former trial Marion testified to 8:30 a. m. over Half Moon Bay and 8:42 at blocks in airport. (T. p. 116).

The evidence, and the only facts in evidence, show that all of these radio aids to navigation were functioning properly that day. That is shown by the aircraft

that flew in 10 minutes before the accident; that is shown by all of the monitors in the tower; that is shown by the ground and flight checks; and that is shown by the aircraft that flew out fifteen minutes later.

VIII. *The Application of the Law to the Foregoing Facts.*

In order to identify this particular place—the ILS outer marker at the west end of the San Mateo bridge—where the transmitters are located, it was required that the flight receive a signal from both of the facilities. And, in this case BCPA had two ADF's on board the aircraft which would, therefore, have gotten two needle reversals, and the aural or visual signals on the marker beacon receiver. The aural signal, in the head phone, was a continuous series of Morse Code dashes. The visual signal was the blue, or blue purple, light flashing a continuous series of dashes, at the same time.

According to all of the pilot witnesses, on both sides, and defense counsel, as well, the pilot was required to receive a signal from both of those facilities, both the marker beacon transmitter and the ILS compass locator transmitter. Without receiving an indication from both, he could not have let down.

And there is no testimony anywhere in the record that there is any place in this area, other than directly over that facility at the west end of the San Mateo bridge, that he could possibly have received *both* of those signals.

The blue flashing light, and the continuous series of Morse Code dashes, can be received only from a half mile to a mile and a half or two miles, from this geographical point, if the flight is where this one should have been, at 3,000 feet.

If we should assume that 4, 5, 6 times, out of "thousands" of times he flew the range legs, he mentioned, Captain Smith experienced false ADF compass reversals, the pilot could not have let down, through the cloud cover, until he double checked, and received either, the flashing blue light or the continuous series of Morse

Code dashes, which a pilot sees and hears at the same time.

And, there is *no* evidence anywhere in this record, in offers of proof, or otherwise, that those signals from the ILS marker beacon transmitter could have been received by that BCPA pilot anywhere else than within a half mile to a mile and a half or two miles from the west end of San Mateo bridge.

When talking about a heterodyne beat lighting up the blue light, Mr. Magner, defense counsel, told us that if that happens to be the one frequency that will light the light, in a range of from 1 to 1500 cycles, for example, if a 400-cycle note came through, he would not want to argue that the one heterodyne which would produce a blue light produced it at that moment. He said: "I think that I would feel that this was a *tenuous* argument." His expert, Crosby, agreed it was "tenuous."

Isn't it equally, or, perhaps, more "tenuous," to argue that out of thousands of flights in the Bay area Captain Smith experienced only "4, 5, 6" false ADF compass reversals?

And, especially, isn't this so in view of the cross-examination:

(1) Smith had never had a false ADF reversal on the *southwest* leg of the San Francisco range, which was the course the BCPA pilot should have been on, the morning of the accident.

(2) There was a "Z" marker at the San Francisco radio range at the time of the accident. So, if a pilot got a false overhead when flying the southwest leg of that range, knowing there was a "Z" marker there, he would not be confused. He wouldn't get his light, unless he was over the station. And he wouldn't get the "Z" marker tone. Particularly, if he knew everything pertinent there was to know about this area (which BCPA admitted their captain did).

(3) Smith had never, in his own experience, had a false ADF reversal going into the outer marker. He had not had that experience when tuned to the outer marker.

(4) Smith had not experienced a false ADF reversal from the Half Moon Bay marker direct to the outer marker, which was the BCPA pilot's clearance.

(5) Smith did not recall ever having a false ADF reversal on both ADF's at the same time. Speaking of the immediate areas where he had experienced false reversals of the ADF compass, he never had the experience when he had both ADF's tuned that they both reversed.

(6) One of the things that will give a false reversal is improper tuning of your instrument. About half of these 4, 5, 6 times were probably caused by improper tuning.

(7) If you have more than one aid, of course, as Captain Lucas said, you have to check both of them. In this area, that we are talking about, we have more than one aid. Captain Smith said you are not going to be misled in this area, if you have two ADF's pointing to the station, and your marker beacon receivers, with the Morse Code aurally and with flashing lights working, and the pilot knows everything about the area, as BCPA admit their pilots knew. It is not going to mislead such a pilot who made 118 approaches in there.

(8) There are methods of proof, should you receive a false overhead, and the sole purpose of training pilots, by giving them false overheads, is to induce them to make a secondary check before accepting it. The pilots are trained to take care of the situation.

(9) When Smith got the 4, 5, 6 false reversals, he did not get any signal from his marker beacon receiver set that would lead him to believe that he was over the marker. He always double checks. If he got a momentary false reversal of the ADF, it did not lead him to think he was over the marker. Not without a double check on the facility, the marker. In the instance of which he was speaking he got no blue lights, no continuous dashes. He got a momentary reversal and back, about 10 seconds and back.

(10) It is impossible for us to state whether the conditions were the same at

that time as they were at the time of the accident.

Since the 1930's, we have had a tremendous amount of experience with the radio aids to aerial navigation, with which we are concerned in this case. The evidence here is overwhelming, and, as a matter of common experience, we would expect it to be, that these facilities are reliable, and not capricious and misleading. You fly with them across the oceans, across the mountains, across the polar regions, across the continents, in times of storm, fog, cloudiness, extremes of heat and cold, wet and dry, and they work. That is all, they work. And airline crews and passengers alike depend upon them, fly by them, live by them; and, if there is any evidence that they ever die by them, the Court hasn't heard it in this case.

Defendants have exhausted ingenuity attempting to prove that the pilot on this BCPA aircraft, the morning of the crash, could have received the ILS outer marker signals where he crashed 10½ miles from the outer marker itself. They have totally failed to prove it.

The station of the transmitters of the ILS outer marker is at the west end of the San Mateo bridge.

Where else, could the BCPA pilot have received the aural or visual signal of the outer marker beacon?

Where else, could he have received the compass needle reversals on his two ADF's?

The answer in this record is nowhere else.

Before the pilot could have let down, under his clearance, it was necessary that he receive the aural, or the visual signal, of the outer marker beacon in addition to the overhead by the compass needle at the compass locator—either or both, in addition to the overhead by the ADF needle.

Defendants have attempted to prove that the pilot could have been confused by the Half Moon Bay fan marker signals.

They have utterly failed in this. Every one of defendants' witnesses has said that the Half Moon Bay fan marker will *not* light the blue-purple light. Every one of their witnesses has said the Half Moon Bay fan marker will *not* give out a continuous series of dashes.

With pilots at defendants' command from Pan-American, United, Quantas, they still did not produce one man who has ever had that happen to him or ever seen it happen. Defendants have not shown a single instance that anyone ever mistook the Half Moon Bay fan marker for the ILS outer marker.

So, we have a flight from Sydney, Australia to Half Moon Bay, California which was without incident and the aircraft was normal in all respects.

A United Airlines plane which came in ten minutes ahead of BCPA reported there was no turbulence coming in over the coast, at Half Moon Bay, in the vicinity of the crash site. (T. 111)

The undestroyed wreckage yielded no evidence of mechanical or structural failure of the aircraft prior to impact.

A new crew came aboard in Honolulu after 36 hours rest.

There was fuel on board for 3½ hours longer than estimated flying time.

The aircraft was loaded to a weight less than its maximum allowable and its center of gravity was located properly.

There was no reference in the numerous communications throughout the extensive flight to any trouble of any kind.

After 0550, Pacific Standard Time, the communications to and from the flight were by *voice*.

Western Air Defense Force Radar personnel reported the position of this BCPA aircraft 0821, Pacific Standard Time, 18 minutes before the pilot reported over Half Moon Bay. The flight was about 70 miles off the coast. There was a definite fix on her at 0821.

At 0839, the flight called San Francisco Approach Control and gave the message: "Half Moon Bay, 0839, at least 500 on top."

Three times the flight was ordered to maintain *at least 500 feet above all clouds*, (0807, 0827, 0839). Twice the flight was ordered to fly *to the ILS outer marker*, (0827, 0839), once, "direct" to the San Francisco outer marker, (0827).

All three of these clearances were *by voice contact*, and the two clearances directing the flight to go to the ILS outer marker were *acknowledged and read back*.

No one, seriously, could urge that the crew did not receive and understand these clearances.

There could have been no doubt in the pilot's mind as to what he should have done.

It is obvious the flight did not maintain at least 500 on top of all clouds.

Neither, did it fly from the Half Moon Bay fan marker "direct to the San Francisco ILS outer marker."

Nor, did it "cross the outer marker initial(ly) at least 500 on top."

The pilot did not fly that aircraft to the ILS outer marker at all.

The time interval was too short to have permitted the aircraft to have flown from the Half Moon Bay fan marker, or intersection, to the ILS outer marker, made the required turn, and returned to the crash site.

Defense counsel Parker admitted that "the airplane couldn't have gone from either the Half Moon Bay fan marker or the intersection to the outer marker and back to the crash site and made a turn in that amount of time." (Page 357, par. 40, Appendix B of this Opinion).

The aircraft crashed at about 0844 on King's Mountain, about 10½ miles from the ILS outer marker.

The distance between the Half Moon Bay fan marker, or intersection, and the ILS outer marker is about 12 miles. The distance between the crash site and the center of the Half Moon Bay fan marker is about 8½ miles.

The elevation of the first tree struck was 2020 feet.

Defendant BCPA admits "aircraft apparently heading parallel range leg, about eight miles south of same just prior to crash."

Under the clearance given this pilot by San Francisco Approach Control he could not, without violating his clearance, have descended into the clouds before receiving the signal of the ILS outer marker. He could not have let down into the clouds until he established himself over the ILS outer marker, at the west end of the San Mateo bridge.

The ILS outer marker, to which this flight was cleared, is the key to the Instrument Landing System at the San Francisco International Airport.

And, there is no testimony anywhere in this record that there is anyplace in this area, other than directly over that facility at the west end of San Mateo bridge, that he could possibly have received *both* of those signals.

The evidence, and the only evidence, shows that all of the radio aids to navigation were functioning properly October 29, 1953. That is shown by the aircraft that flew in 10 minutes before the accident; that is shown by all of the monitors in the tower; that is shown by the ground and flight checks; and that is shown by the aircraft that flew out fifteen minutes later.

### The Warsaw Convention

Reference is made to this Convention on Page 291 of this opinion.

Article 17 of the Warsaw Convention imposes an absolute liability upon the air carrier for all personal injuries, regardless of fault, "if the accident which caused the damage so sustained took place on board the aircraft." The accident which caused William Kapell's death, of course, took place on board the aircraft.

But this liability is excused by Article 20(1), if "the carrier proves" that it has "taken all necessary measures to avoid the damage or that it was impossible" for it to take them. As to this the burden is upon the carrier.

Defense counsel who summed up the case to the jury said the carrier had not sustained the burden and that the jury should find for the plaintiffs the amount of the limited liability, 125,000 francs for the death, about $8300. (Appendix "B", p. 357, par. 41). The jury didn't give the widow and children even that amount.

Article 22 of the Warsaw Convention limits the liability of the carrier for the death of a passenger to 125,000 francs.

There is an exception to this limitation in Article 25(1):

(1) Le transporteur n'aura pas le droit de se prevaloir des dispositions de la presente Convention qui excluent ou limitent sa responsibilite, si le dommage provient de son dol ou d'une faute qui, d'apres la loi du tribunal saisi, est consideree comme equivalente au dol.

(2) Ce droit lui sera egalement refuse si le dommage a ete cause dans les memes conditions par un de ses preposes agissant dans l'exercice de ses fonctions.[9]

The Warsaw Convention was drawn up in a single copy in French only. (Art. 36.) That text alone is authentic and binding.[10] Hence, the study of the French text is important and unavoidable.

The Convention was enacted into English Law by the Carriage by Air Act, 1932, in which was set out the "official" English translation of the French text of the Convention.

Except for a small difference, which is of no importance here, the American "official" translation is the same as the British.

The Senate of the United States advised adherence on June 15, 1934.[11]

The exception to the limitation of liability in Article 25(1) presents vexing problems of interpretation arising from the use of the phrase, *"dol ou d'une faute qui, d'apres la loi du tribunal saisi, est consideree comme equivalente au dol."*

The word *"dol"* and the expression *"faute equivalente au dol"* have no exact equivalents in the common law system. The term *"dol"* is a civil law concept, obviously based upon the Latin *dolus,* and has various meanings even in France. One of those meanings is deceit or fraud, but that is not in the context here under consideration. See, American Airlines, Inc. v. Ulen, (1949) 87 U.S.App.D.C. 307,

---

9. One of the Netherlands delegates to the Hague Conference of 1955, Huibert Drion, translates Art. 25 as follows: "The carrier shall not be entitled to avail himself of the provisions of this Convention which exclude or limit his liability, if he has caused the damage intentionally and wrongfully or by such fault as, in accordance with the law of the Court seized of the case, is considered equivalent thereto."

"Similarly he shall not be entitled to avail himself of the said provisions, if the damage was caused as aforesaid by one of his servants or agents acting within the scope of his employment." (H. Drion, "Limitation of Liabilities in International Air Law." The Hague, Holland, 1954, p. 195).

10. The Rome Convention of 1952 was done in English, French and Spanish, "each text being of equal authenticity." (Art. 39).

The Hague Protocol of 1955 to amend the Warsaw Convention is in "three authentic texts", English, French and Spanish. "In the case of any inconsistency, the text in the French language, in which language the *Convention* was drawn up, shall prevail." Shawcross and Beaumont, 2nd Cumulative Supplement to 2nd Ed. 1955, page XXVIII.

11. The American translation, at 49 Statutes at Large, page 3020 is:

"(1) The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his *wilful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct.*

"(2) Similarly the carrier shall not be entitled to avail himself of the said provisions, if the damage is caused under the same circumstances by any agent of the carrier acting within the scope of his employment."

186 F.2d 529, 533. One finds, in the literature touching this subject, the suggestion repeated that "dol" means to inflict damage intentionally and wrongfully.[12]

As to "faute equivalente au dol", it is, by the wording of the Article, left to the courts of each nation to decide in every case whether or not a particular fault is to be given the effect of "dol", and so, to remove the limitation of the carrier's liability.

In the Draft Convention of the First Conference on International Private Air Law, at Paris, in 1925, there were no exceptions to the limited liability of the air carrier.

Soon, however, exceptions were suggested to relax the severity of the principle. And, the provision that the limitation upon liability should not apply in case of damage caused by "actes illicites intentionelles" (intentional illicit acts) was inserted by the Second Commission of the Comite International Technique d'Experts Juridiques Aeriens (CITEJA). This was done in 1927, and was continued in that form until the Warsaw Conference.

It is clear enough, from the minutes of the discussions at the Warsaw Conference, that the delegates wanted to extend the class of cases of unlimited liability beyond that in which the air carrier caused the damage intentionally and wrongfully.[13]

It is clear enough, also, that the delegates intended to agree upon the principles of "dol" and "faute lourde", and

referred to the drafting committee the choice of a formula to express them.

A translation of the minutes of the Warsaw Conference, pp. 40–42, 139 and 140 follows:

The German delegate proposed the assimilation of "faute lourde" (gross negligence) to "acte illicite intentionelle." He said, one can admit the carrier should not be responsible for simple negligence or imprudence, but it must be understood that in the case of "faute lourde" the carrier incurs the same responsibility as in the case of "dol". (page 40).

SIR ALFRED DENNIS—(Great Britain)—opposed the use of the term "acte illicite intentionel":

"It is very difficult for us to understand these words. It is very difficult for us to know what the word 'illicit' means accompanied by the word 'intentionel'.

"We have supposed", he continued, "that the meaning of this expression should be restricted to the case of an act done with the deliberate design to cause injury or harm."

"We have with us the expression 'wilful misconduct'. I believe that it covers all that you want to say; it covers not only acts committed deliberately, but also acts d'insouciance sans egard aux consequences." (page 40).

With respect to "faute lourde", SIR ALFRED DENNIS said: (page 41).

"This expression is not known in our laws; it is a question of degrees of negligence. We would not be able to translate into our language 'faute lourde' so as to give it a legal meaning." [14]

12. Drion, ibidem, p. 198, Note 5, "The notions dol and faute intentionelle, are used interchangeably." Henry Zoghbi, a Lebanese lawyer and member of the Societe Francaise de Droit Aerien, in his "Responsibilite Aggravee du Transporteur Aerien, De Varsovie a La Haye par Paris et Rio de Janeiro" (Beyrouth, 1960).

13. Note particularly, pages 40–43 Proces-verbaux de la Deuxieme Conference Internationale de Droit Prive Aerien, 4–

12 Octobre 1929, Varsovie, and, also pages 139–141, 172 and 226–227.

Drion, page 221, par. 185: "If Article 25 were limited to the intentional infliction of damage, little difficulty would arise in its application. But there can be no doubt that it was intended to go further than that."

14. True it is, that distinctions between degrees of negligence in the law of bailments and carriers were long since abolished. But, is this any reason for believ-

M. ARENDT—(Luxembourg)—"The question that is raised at this moment by SIR ALFRED DENNIS is not a new one. It has been discussed already in the CITEJA. The difficulty comes because one tries to express the word '*dol*' in certain languages.

"For us who are imbued with the Roman law, the matter would be resolved by the word '*dol*'. But it is because the word '*dol*' has been criticized by certain delegations and, if my memory is correct, notably by the British delegation, which has said there is no word that can render completely the word '*dol*', that one has made the decision to explain the word '*dol*' by the words '*acte illicite intentionnel*', but if one wanted to come back to the law clear and certain, one would replace this expression with the word '*dol*'. May the other delegations search for something else; they certainly in their own law have a word that corresponds to this idea.

"The '*faute lourde*' equally, in French, is very easy to understand. It is found in many dispositions and it has never given any difficulties. On the contrary, such wrongs have been weighed justly by the courts.

M. GIANNINI—(Italy)—"I believe that at bottom we have here a question of wording that is very difficult to resolve.

"The German delegation, if I do not deceive myself, says: We must assimilate completely '*faute lourde*' to '*dol*'.

"On the other hand, I believe that the English notion corresponds, perhaps not entirely, but almost entirely to '*dol*' and to '*faute lourde*'.

"Under these conditions, I believe that we are all in agreement. It is a question simply of finding the best formulation. As M. ARENDT has said the formulation that we criticize today has been presented with the idea that it could be translated into English. It seems that we have deceived ourselves.

"I estimate that it would be much better to study this question in the drafting committee, but upon the heart of the problem we have agreed in CITEJA, and I believe that here it will not be difficult to put us in agreement.

"Therefore, I propose to refer the question to the drafting committee."

M. RIPERT — (France) — "There would be agreement if one could find a formula precise enough to avoid unlimited liability of the carrier without wilfully caused damage. But the German proposal goes much farther and would assimilate *faute lourde* to *dol*. The German delegation proposes to make the carrier responsible every time he has committed '*une faute grave*'.

"This proposition is extremely dangerous.

"If it is true that in certain countries, for instance, with us, '*faute lourde*' is assimilated, in certain cases, to '*faute intentionelle*', it is because when this formula is applied in a certain country it produces no inconvenience; but if you introduce into an international convention such a broad expression, such an imprecise expression as that of '*faute lourde*' one fears, that in other countries, which do not further or promote aviation, the tribunals will declare with respect to an accident that a '*faute lourde*' has been committed.

"I am not opposed to the idea, (of assimilating '*faute lourde*' with '*dol*') but I distrust all general formulae in which might be inherent the danger of nullifying the Convention. You will understand that a court is always free to declare, in case of an accident, that a '*faute grave*' has been committed by the carrier. We shall therefore submit to the different jurisprudences, if we cannot assure a unity in an obligatory text. But I feel that it would be better if the drafting committee succeeds first in finding one formula."

ing that words could not be found to express the idea that gross negligence is a kind of conduct, which, like intentional

wrongs, should deprive the carrier of his limited liability?

M. PECANHA—(Brazil)—" * * * Therefore, I am of the opinion of my French and Italian colleagues; one must find a new formula which makes the application of the text much easier."

M. LE PRESIDENT—"Gentlemen, I therefore have a request to refer this to the drafting committee. Will someone speak to this proposal?" (page 42.)

M. PITTARD—(Switzerland)—However, it would be necessary that the drafting committee should know if one will assimilate 'faute lourde' to 'dol', because 'dol' is a positive notion of the will. 'Faute lourde' can be a negative notion.

"I am not opposed to discussing the assimilation of 'faute lourde' to 'l'acte intentionnel', but I believe that one must discuss it in order to find a formula."

M. RIPERT—(France)—"The thing is to refer this matter to the drafting committee, when it is agreed to make the assimilation, if one can find a formula that is precise enough."

M. PITTARD—(Switzerland)—"We shall be disposed to assimilate 'faute lourde' to 'l'acte intentionnel', (gross negligence to intentional acts), if we find a formula which gives satisfaction to the various legal languages represented here." (The minutes record that the delegates received this statement with "Approbations"). (page 42.)

M. LE PRESIDENT—"In that case, gentlemen, we refer the question to the drafting committee."

The Chairman of the drafting committee, M. GIANNINI of Italy, at the second reading, reported:. (p. 139) "We have succeeded in finding this formula, which also has satisfied our friends of Great Britain, by which we have succeeded in adapting the expression of 'faute lourde' and of 'dol', an expression which is difficult to translate into English.

"I believe that the desire of the conference finds satisfaction in this formula."

Drion says: [15] "It is important to note that the agreed text retained the French word dol for which it is actually difficult to find an English equivalent, but that it replaced by an ambiguous phrase the term faute lourde which could easily and satisfactorily have been translated into 'gross negligence'. * * * Before the vote on the Article was taken Sir Alfred Dennis explained his understanding of the text in the following words: 'I should like that it be recorded in the minutes that it followed from the explanations which have been exchanged that we have in English the expression 'wilful misconduct' to translate these words, which expression is well known and has a well defined meaning in our law.'." (p. 140).

The words 'actes illicites intentionelles', inserted in 1927 by the CITEJA, were deleted in 1929 by the Warsaw Conference. Instead, the Conference accepted the suggestion of the Luxembourg delegate, M. ARENDT, that "if one wanted to come back to the law clear and certain one would replace this expression with the word 'dol'."

And, apparently, unsuccessful "in finding one formula" which could assure "a unity in an obligatory text", the Warsaw Conference adopted the suggestion of the French delegate, M. RIPERT, "We shall therefore submit to the different jurisprudences." And the text, therefore, reads, "dol ou d'une faute qui, d'apres la loi du tribunal saisi, est consideree comme equivalente au dol."

Not only is the view, that the delegates intended to agree upon the principles of "dol" and "faute lourde", supported by the Minutes of the Conference. That view has strong support in the following: (Drion, pages 203, 204, 208–210.)

(a) "There can be little doubt that, at least as far as France, Italy, Germany, and Switzerland are concerned, the national label for the fault considered equivalent to dol was understood to be faute lourde, colpa grave, and grobe Fahrlassigkeit."

(b) "The chairman of the drafting committee which was responsible for the text of Article 25, wrote in a study of the Convention published immediately after

15. Ibidem, p. 199.

it was signed at Warsaw, that this provision applies in cases of *'dolo o colpa grave'*."

(c) "When the question of *dol* and *faute lourde* was again discussed in the Rome Conference, (of 1933) those who also had attended the Warsaw Conference clearly considered that Article 25 of the Warsaw Convention was intended to cover both *dol* and *faute lourde*."

(d) The Rome Convention of 1933 "abandoned the unfortunate formula of the Warsaw Convention and, at the suggestion of the British delegate, substituted the time honored combination of *'faute lourde ou dol.'* "

(e) "Nearly all of the civil law countries which have enacted the Warsaw Convention into their legislation have translated the fault equivalent to *'dol'* into the national words for gross negligence, the Netherlands, Italy, Germany, the Scandinavian Countries, Switzerland," etc., etc.

(f) Daniel Goedhuis who presided at the Hague Conference of 1955, deals with the problem on pp. 221–225 of his book "La Convention de Varsovie" (The Hague, 1933). He states that it was the Warsaw Conference's intention to assimilate *faute lourde* (or gross negligence) to *dol*. The reason why the expression *faute lourde* was not finally used in the text of the Convention was the British delegation's claim that it was not easy to translate into English.

■ But, it is unnecessary, in the present case to go so far as the foregoing suggests. We need not consider gross negligence. Indeed, the authorities in the Second Circuit, by which the court feels himself bound, go no further presently, than the British delegate, Sir Alfred Dennis' suggestion: "We have with us the expression 'wilful misconduct'. I believe that it covers all that you want to say; it covers not only acts committed deliberately, but also acts d'insouciance sans egard aux consequences." Drion, p. 198, translates the French phrase as "acts of carelessness without any regard for the consequences."

■ Mindful that we are construing a treaty (though a difficult one to construe), and that the *lex fori* ordinarily would not apply, Sir Alfred Dennis' English translation of what the delegates had in mind was accepted at Warsaw. So that *is* treaty law.

To become completely confused in one's attempt to construe Article 25(1), it is only necessary to note that the British mis-translated its formula, and the Americans followed suit.

Sir Alfred Dennis, before the vote on the Article was taken, asked that it be recorded in the minutes, "that we have in English the expression 'wilful misconduct' to translate *these words,* which expression is well known and has a well defined meaning in our law."

By "these words" was meant, quite obviously, the whole formula, i. e. in Sir Alfred's words, "all one wanted to say, not only acts committed deliberately, but also acts of carelessness without any regard for the consequences."

■ There can be no doubt that the second half of the formula, namely "or by such fault as, in accordance with the law of the court seized of the case, is considered equivalent" to dol, was adopted by the delegates to enable the English to translate with "wilful misconduct" *both* "dol" *and* the equivalent fault.

The chairman of the Drafting Committee said so (minutes p. 41): "I believe that the English notion corresponds, perhaps not entirely, but almost entirely to *'dol'* and to *'faute lourde.'* "

But what have the British and American translators done? They have translated the word "dol" *alone* as "wilful misconduct". And, yet, they have retained the equivalent fault phrase, which now has no meaning whatever. Furthermore, in the equivalent fault phrase they have translated "faute" (fault) as "default" and compounded the confusion. Compare the American translation, Note 11, with Drion's translation, Note 9 in this opinion.

Of this sorry situation, Drion writes: "Before entering into a discussion of the

court decisions involving Article 25, some words should be said on the curious drafting history of that Article. Although there can be no doubt that the unhappy phrase ('faults which by the national court seized of the case, are considered equivalent to dol') had been adopted to enable the English legislator to use the notion 'wilful misconduct' which would comprise both *dol* and the somewhat mysterious 'equivalent fault', the Carriage by Air Act, 1932 has translated *dol* by 'wilful misconduct' and has retained the phrase about the equivalent fault, the purpose of which became entirely obscure. To make confusion complete the French 'faute' was translated into 'default'.[16] It is not surprising that an English Court finds itself somewhat perplexed by the resulting text, and comes to the conclusion that the words were only inserted to take care of some oddity of a foreign law." (Horabin v. B. O. A. C. [1952] 2 All Eng.Rep. 1016, 1019, Barry, J.)

It is this unhappy phrase in Article 25(1) which we must apply. It is by no means clear and certain. Unity among the delegates could not be reached on an obligatory text. So, the "mysterious" equivalent fault was left to the choice of the courts of each nation. In the civil law nations that choice is gross negligence. That's what "faute lourde" means to Frenchmen. And, the time honored "dol et faute lourde" is what the delegates thought they were adopting. The chairman of the Drafting Committee reported on the second reading: "We have succeeded in finding this formula, which also has satisfied our friends of Great Britain, by which we have succeeded in adapting the expression of *'faute lourde et dol'*, which expression is difficult to translate into English." The Chairman had also said that the English notion "wilful misconduct" corresponds "perhaps not entirely, but almost entirely, to *'dol et faute lourde.'* "

If unity among the nations was the goal at Warsaw, it was not achieved. The Irish translation of "dol" is "malice". The British and American translations are inaccurate. To every attempt to find appropriate French terms, Sir Alfred Dennis said the English wouldn't understand them. Only the single copy in French is authentic and binding.

The United States was not a party to the Paris Conference of 1926 or the Warsaw Conference of 1929. We were not represented there. Secretary of State Cordell Hull, in 1934, stated our purpose in adhering to the Convention in a letter to President Roosevelt:[17] * * * "the principle of limitation of liability would lessen litigation and prove an aid in the development of international air transportation, as such limitation will afford the carrier a more definite and equitable basis on which to obtain insurance rates and eventually reduce the operating expenses of the carrier."

In short, the Warsaw Convention was a device by which to subsidize the *then* infant industry of international air transportation.[18] It is a strange concept to us

16. The French word "faute" embraces both intentional and negligent acts and omissions.

17. S.Doc.Exec.G, 73rd Cong., 2nd Sess. 1934.

18. Kreindler, "Aviation Accident Law", (1963) Vol. 1, p. 342:
  "The enactment of the Warsaw Convention, in 1929, was the result of international conferences on air law held in Paris in 1926 and Warsaw in 1929. Its inception may be better understood in the light of its historical perspective. 1927 was the year in which Lindberg flew the Atlantic. Amelia Earhart did it in 1928. In 1929 it was still uncertain whether the air age would be carried forward with lighter-than-air craft or heavier-than-air craft. The international air giants of today were literally in their swaddling clothes. Air France, though founded in 1919, did little more than link France with England and Africa. KLM was limited to flights of two hundred or two hundred and fifty miles. Pan American was the United States' only international carrier and its international operations were confined to linking Havana, Cuba and Key West. Passengers were not carried at night, and airplanes had a top speed of one hundred fifty miles an

in the United States that the subsidy should be taken out of the widows and orphans of passengers. And, it is a far cry from the infant industry of 1929 to the international air giants of today.

The formula in Article 25 which we construe today was abandoned at the Rome Conference in 1933, only four years after its adoption in 1929.

The most important international agreement in this field, since Warsaw, is the Protocol to the Warsaw Convention and the Final Act of the Conference on private air law held at the Hague in September, 1955, which entered into force August 1, 1963, upon the deposit of 30 instruments of ratification.

The Protocol has not yet been ratified by the United States Senate, and has not entered into force in the United States.

The Hague Protocol amends the Warsaw Convention and attempts to solve the difficulty of interpreting the formula of Article 25 by deleting and replacing it with an expression which is common both to the civil and the Anglo-American legal systems.

The Protocol was adopted in three official texts, English, French and German. The English text of the revised Article 25 follows:

"The limits of liability specified in Article 22 shall not apply if it is proved that the .damage resulted from an act or omission of the carrier, his servants or agents, done with intent to cause damage or recklessly and with knowledge that damage would probably result; provided that, in the case of such act or omission of a servant or agent, it is also proved that he was acting within the scope of his employment."

In the Hague Protocol Article XIII, the alternative conduct which removes the limitation on liability is that done "recklessly and with *knowledge* that damage would probably result."

The Court of Appeals for the Second Circuit in Pekelis v. T. W. A., 187 F.2d 122, 23 A.L.R.2d 1349 (1951), cert. denied 341 U.S. 951, 71 S.Ct. 1020, 95 L.Ed. 1374, approved Judge John F. X. McGohey's charge which included: "Wilful misconduct * * * may be the intentional performance of an act in such a manner as to imply reckless disregard of the probable consequences of the performance of the act.

"Likewise, the intentional omission of some act * * * in a manner from which could be implied reckless disregard of the probable consequences of the omission, would also be wilful misconduct."

It will be noted that the Hague Protocol requires *"knowledge"* that damage would probably result. The Second Circuit does not. In addition to Pekelis see Grey v. American Airlines, 227 F.2d 282, 285 (1955), which approved a charge which included: "There must be a realization of the probability of injury from the conduct, and a disregard of the probable consequences of such conduct."

The origin of all of this language is what Sir Alfred Dennis said at Warsaw. And, it is important to observe exactly what that was. (See this opinion, page 318). He suggested that "wilful misconduct" would cover "not only acts committed deliberately, but also acts *d'insouciance* sans egard aux consequences." This translates into acts of *carelessness* without any regard for the consequences. It is quite a leap from "carelessness without any regard for the consequences" to *"recklessly* and with *knowledge* that

---

hour. Even in domestic travel, only 52,-934 passengers were carried by air in the United States, in 1928.

"Probably the principal problem facing the budding international airlines was the securing of capital in the face of what appeared to be enormous hazards. In the absence of a limitation of liability one disaster might sweep away a large capital

investment. It was in this atmosphere and era that the Warsaw Convention was enacted. Its most important provision was a limitation of liability for personal injury and death to passengers, to 125,-000.00 Poincare French francs (gold francs of a weight and fineness equivalent to approximately $8,300.00)."

damage would probably result." All the more so when a judge is talking to a jury.

Judge McGohey, in Pekelis, recognizes the very important particular which distinguishes reckless misconduct from intentional wrongdoing, namely, the actor need not intend to cause the harm which results from the conduct. For example, our present case, Article 25(1) does not mean that defendant BC PA, or the pilot had to have a deliberate intention to kill William Kapell, to wreck this aircraft, or to commit suicide. If the pilot is instructed by the tower to stay 500 feet on top of a cloud cover, and he nevertheless descends into the clouds, the requisite intention is present if he intended to violate his instructions and do what he was doing. In order to be "wilful misconduct" he need not have intended to cause the harm which resulted. The consideration that the delegates accorded to Sir Alfred Dennis lends support to this view.

The court believes that minds of reasonable men cannot differ upon the evidence in this record. The foregoing Second Circuit decisions provide the rule of law. Those decisions closely correspond, (a) to what the British delegate at Warsaw told the other delegates would be the English interpretation, and, (b) to our own American Law Institute analysis of the same subject.

In exploring the law, more analysis is helpful than the abbreviated formulae of the Convention, and of the British delegate. The American Law Institute contribution in this area is Section 500 of the Restatement on Torts. It there analyzes and spells out the essential ingredients of the notion with which we are here concerned.

To come to this case, more particularly, perhaps Section 500 of the American Law Institute Restatement on Torts is the way between the Scylla and Charybdis of limited and unlimited liability, which the language of Article 25(1) presents.

Section 500, and the comments formed the basis of the Court's charge in this case (Appendix C).

That the pilot intentionally did an act can hardly be disputed. He was directed, at 0827, to "maintain at least 500 feet above all clouds." Well, he didn't. He left the sunshine and got down into the cloud cover, and, of course, he knew he was in the clouds.

He, also, was directed to fly from the Half Moon Bay fan marker "direct to the San Francisco ILS outer marker." Well, he didn't do that either. In view of the evidence in this case, he must have known that he was not following that clearance.

He, also, was directed, at 0839, to cross the ILS outer marker "at least 500 on top." There is nothing more clear in this case than that he didn't do that either. He couldn't have received the signals from *both* the marker beacon transmitter and the needle reversals of the compass locator transmitter anywhere near the crash site.

And everyone agrees that it was a violation of his clearance to let down into the clouds without receiving those signals.

He, also, violated safety regulations, in what he did, and, again, he must have known it.

The Restatement comment b. illustrates the point:

"It is reckless for a driver of an automobile intentionally to cross a through highway in defiance of a stop sign if a stream of vehicles is seen to be closely approaching in both directions, * * * "

The British trial judge in Horabin v. B. O. A. C., supra, illustrates the difference between wilful misconduct and the cases of gross negligence not involving wilfulness by an example of two men driving motor cars through traffic lights after they have been changed from yellow to red: "In both cases there are the same act, the same traffic lights, the same crossroads, and the same motor cars.

In the first case the man may have been driving a little too fast. He may not have been keeping a proper look-out, and he may not have seen the lights (although he ought to have seen them) until he was too close to them and was unable to stop, and, therefore, crossed the roads when the lights were against him. He was not intending to do anything wrong, to disregard provisions of the Road Traffic Act or to endanger the lives of anyone using the road, but he was careless in not keeping a proper look-out and in going too fast, and as a result, without intending to do anything wrong, he committed an act which was clearly an act of misconduct. The second driver is in a hurry. He knows all about the lights, and he sees in plenty of time that they are changing from yellow to red, but he says to himself: Hardly any traffic comes out of this side road which I am about to cross. I will go on. I am not going to bother to stop. He does not expect an accident to happen, but he knows that he is doing something wrong. He knows that he should stop and he is able to stop, but he does not, and he commits exactly the same act as the other driver. But in that frame of mind no jury would have very much difficulty in coming to the conclusion that he had committed an act of wilful misconduct."

What the BCPA pilot did involves an easily perceptible danger of serious bodily harm, or death, and the chance that it would so result was very great. There was a high degree of probability that it would result.

▇ In order that the pilot's conduct may be reckless, it is not necessary that he himself recognize it as being extremely dangerous. His inability to realize the danger may be due to the abnormally favorable results of previous conduct of the same sort. Section 500c.

There is uncontradicted testimony in the record that all summer and early fall before October 29, 1933, it was the custom and practice of the BCPA planes to come in around King's Mountain and down into the airport just about on the course this one seemed to be heading on. No one was called by defendants to deny that. (P. 354, par. 33, Appendix B to this opinion.)

The pilot need not recognize this as extremely dangerous; it is enough if he knows or has reason to know of circumstances which would bring home to the realization of the ordinary reasonable man the highly dangerous character of his conduct. The test is an objective one, and brings to mind the statement of Brian in YB 17 Edw. IV 1, nearly five hundred years ago:

"It is trite learning that the thought of man is not triable, for the devil himself knoweth not the thought of man."

Henry Zoghbi, (supra Note 12.) distinguishes *dol* and *faute lourde* in a way which very clearly shows the test of Sir Alfred Dennis' "carelessness" to be an objective one: "To say that *faute lourde* is equivalent to *dol* does not mean that these two terms are equivalent from all points of view. *Dol* is intentional wrong, and can only be established by exploring the psychology of the one who committed it. *Faute lourde* is not intentional and can be established *in abstracto*, in an objective way, by reference to standard behavior (such as that of the "good father", *bon pere de famille*) without requiring the exploration of the conscience of the one who committed the wrongful deed. Sometimes, however, the damaging act is committed with such recklessness, such negligence, and such an unconcern for consequences that it shocks the sense of justice as much as *dol* does, and consequently, leads one to presume *dol*, or makes it seem as a case of *dol* in which the intention to harm cannot be proved. The one who committed the act has shown a clumsiness and a carelessness of such proportions as to lead one to believe that he had the intention to harm although it cannot be proved."

▇ It is enough that he realizes or, from facts which he knows, should realize that there is a strong probability that

harm may result, even though he hopes or even expects that his conduct will prove harmless.

The circumstances must be such that the risk created is unreasonable.

Can anyone doubt it?

The motions are granted. Judgment will be entered for the plaintiffs on the issue of liability and a new trial is granted on the damage issue only.

## APPENDIX A.

## APPENDIX B.

Defense attorney Parker's closing argument is a strong demonstration the airline has no defense to plaintiff's claim. That argument was reported in full, (T 1815–1875). A critical analysis of it by plaintiff's counsel is found in the transcript of the hearing in Salt Lake City, pages 35–116, to which defense counsel responded in their Memorandum in Opposition to Plaintiff's Motions for Judgment Notwithstanding the Verdict and for a New Trial dated May 25, 1961, pp. 15–54.

As good a method as any to evaluate the evidence is to examine both counsel's positions with respect to that argument. We at once examine their claims, analyze the evidence and test the validity of the verdict. To this end the Court has made his own analysis of the argument and the record. The transcript references to the trial in New York are shown, for example, as (T 1818), to the Salt Lake City hearings (SLT 37).

1. Plaintiff's Criticism (SLT 37):

"And then we come to these, these little pecadillos as we come to 1818:
" 'Here we had an accident in the year 1953. The complaint was filed in 1954. Then after all the pleadings are in, the plaintiffs come and set their case for trial. Here it is 1961 that the case is set for trial.'
"Let's go along. That of itself isn't even a breeze to indicate the hurricane that is to come."

(SLT 38):

"Let's go on. Page 1821.

" 'We have to prove, by a preponderance of the evidence that the airline took every measure necessary to avoid the loss, or that it was impossible for them to take such measure. In all fairness, *we certainly have not sustained that burden of proof*. We haven't brought in *any* evidence to show. We don't know what the pilot did.'

"Two things: No. 1: They have admitted their negligence; they have admitted their mistake. We didn't sustain our measure to show that we did everything to avoid the law. And then they say, 'We don't know what our pilot did.'
"*They don't have any evidence, they say, here*." (Emphasis supplied).

NOTE BY THE COURT: In a Warsaw Convention case, there is a limited liability, which is absolute, placed upon the airline by force of the treaty, which it can avoid only by discharging its burden to prove that the carrier and "his agents have taken all necessary measures to avoid the damage or that it was impossible for him or them to take such measures." [1]

This liability of the carrier is limited to the amount of 125,000 francs for each death. (In this case $8291.87 for the death of William Kapell, $497.40 for loss of checked baggage, $331.61 for loss of personal effects not checked.)

In the above excerpt from the record, defense counsel admit to the jury, "We certainly have not sustained that burden of proof. We haven't brought in *any* evidence to show. We don't know what the pilot did."

Defense counsel says here that they don't have any evidence.

In the face of this, it is extraordinary, to say the least, that the jury did not return a verdict for the small amount for which there was an absolute liability.

2. Plaintiff's Criticism (SLT 39):
"And then they come to the definition and the mis-statement of law on this definition——it started at a low level. The definition is given abstractly and academically, a higher burden than we have. Later on he will tell that jury that that pilot had to intend this (spelling) t-h-i-s, this accident. We will come to that. But here is how he starts—
" 'The pilot has to intend to do an act with knowledge that in all probabil-

1. See Opinion, Footnote 2, page 291.

ity that intentional act that he does is going to result in damage or injury, and he has to intentionally do that act, knowing that in all probability it is going to result in injury, and *with complete and utter disregard of that probability.*'" (Emphasis supplied).

"Conjunctive, not the disjunctive."

NOTE BY THE COURT: This is a clear mis-statement of the law, and contrary to the Court's charge, (T 1949–1954). (a) The pilot need not have "knowledge." It is enough if he acted "knowing or having reason to know of facts which would lead a reasonable man to realize that his conduct not only created an unreasonable risk of bodily harm to the passengers, but also involved a high degree of probability that substantial harm would result to the aircraft and the passengers by the doing or failing to do the act in question." (b) Certainly the pilot need not have knowledge "that in *all probability* the intentional act that he does is going to result in damage or injury." (c) Bad as these are, worse still than either is the third. Counsel added: *"and with complete and utter disregard* of that probability." (Emphasis supplied).

The law and the Court's charge require only "reckless disregard of the probable consequences," not "complete and utter disregard."

And this is tied to all that went before by the conjunctive "and."

This is a higher burden than plaintiffs have, but later on defense counsel will tell the jury, as we shall see, that the pilot had to intend *this* accident.

3. Plaintiff's Criticism (SLT 40):

"The widow, the little children, the tears of the bereaved, I assume, are legitimate harangue, on the part of defense counsel, as well as plaintiffs' counsel. *But it is not legitimate to confuse or distort the record and that is the thing.*" (Emphasis supplied.)

"Quoting from Parker: 'But I do say it is a privilege to stand before you and argue the United States Constitution. I only trust in my own heart, and I am sure we all do, that the United States Constitution will be determining the rights of those two little children as long as they live.'

"No quarrel with that. But page 1825:

"'Now, ladies and gentlemen, let's review the *strategy plaintiffs have followed in this case.* If you have a case where there isn't liability you come into a court of law and try to *snowball a jury into a great big verdict.* How do you do it? You do it exactly the way the plaintiffs have done it here—*confusion, confusion all the way through.* We will go into the *confusion* that has been brought out in this case point by point.'" (Emphasis supplied.)

"Legitimate still, legitimate, if I may, harangue of counsel."

4. Plaintiff's Criticism (SLT 41–42):

"And over to 1828. We are now getting closer.

"'Plaintiff has spoken a lot about time, time—he couldn't have done this and that in that time. If you recall the testimony of Mr. Marion, it took them 12 minutes to go from Half Moon Bay fan marker in, make an instrument letdown, land at San Francisco Airport, taxi to the end of the runway, taxi off the runway, taxi over to the Administration Building, turned around, go through a check list that I don't know had how many items. He said they had to go through with their hundreds of controls and instruments in the cockpit, shut the airplane down, and enter a time in the log book.

"'That was accomplished in 12 minute by United Airlines.'

"The record at page T 106 shows—

"'Question: Now, do you know roughly what time it was that you were over Half Moon Bay?

"'Answer: Well, we landed at 8:42 or so. It would be instrument ap-

proach.   Back about 8:25, 8:30, around there.'

"MR. BELLI: That is minor, the 'around there.' We will come to something that is a little more specific that it couldn't have been 8:42, it couldn't have been 8:45, that 'We don't know when it was.'

"We have their own report that says that they made determination themselves. This is one page that .we got from the report, that they fixed the time of the accident themselves at 8:44."

NOTE BY THE COURT: In the statement above Parker says Marion testified: *"He said they had to go through with their hundreds of controls and instruments in the cockpit,* shut the airplane down, and enter the time in the logbook." (Emphasis supplied.)

The witness said nothing of the kind. The record is (T 117):

"Q   Do you have to go through any check list before you shut off the engines?

"A   Yes, we do.  I don't recall what they were on the Boeing, however.

"Q   Do you remember approximately how many items you had to accomplish in that check list?

"The Witness: I don't remember really on the Boeing.

"Q   But you did have to accomplish a check list, did you not?

"A   Yes, sir.

"Q   And then shut the four engines down?

"A   Yes, sir.

"Q   And when the engines were stopped then that is the time you were at the blocks?

"A   Yes, that could be considered that.

"Q   You note that time and put the entry in your log book?

"A   Yes, sir.

"Q   And that was eight forty-two?

"A   (Witness nods head up and down.)

"Mr. Parker: No further questions."

5.   Plaintiff's Criticism (SLT 42): Parker at T 1829 said:

"Mr. Marion also told us that the area was completely covered with clouds; he was flying over this blanket of white—clouds, clouds, clouds. He was dependent upon receiving signals on his radio equipment that he had reached a geographical position before he started his instrument letdown. And there was no way to determine that he was over that geographical position unless he received these radio signals."

Plaintiff's counsel says:

"And that's not correct."

The record shows:

"Q   Now could you see any of the hills up above the fog?

"A   Yes, we could.  I remember seeing Mount Tamalpais to the north and Black Butte Mountain to the south sticking up above this overcast or undercast, really.

"Q   And other than those two mountains, did you see any other hills?

"A   Not that I remember or could name.  Possibly were some.

"Q   But you didn't see any other than these two?

"A   I mean those are the ones that were obvious and I noticed."

NOTE BY THE COURT: Parker's statement was not true.

(a) Marion did not tell us that area was *"completely covered* with clouds."

(b) Did not tell us that he was flying over this "blanket of white—clouds, clouds, clouds."

(c) Marion said he could "remember" seeing Tamalpais and Black Butte sticking up above the clouds.

(d) He did "not remember" seeing "any other hills" he "could name."

(e) "Possibly were some."

(f) To question: "But you didn't see any other than those two?" Witness answered: "I mean those are the ones that were obvious and I noticed."

(g) Marion did not tell us, "He was dependent upon receiving signals on his radio equipment that he had reached a geographical position before he started his instrument letdown. And there was no way to determine that he was over that geographical position unless he received these radio signals."

(h) Marion had nothing to do with the navigation of the airplane T pp. 114 and 115. (This was brought out by Parker's examination.)

(i) But more than that. Witness Jacobs, United Air Lines flight engineer on flight that left San Francisco airport at 9:00 A.M. October 29, 1953, the day of the accident, testified (T 289–290):

"Q Now, you got into the air that morning, and you were airborne about what time on the morning of the accident?

"A Around 9, maybe a few minutes after, I believe.

"Q And did you go out the regular way towards Honolulu then?

"A No, we were requested to go out and search, see if we could see anything that had happened. They said a plane was missing.

"Q That was about 9 o'clock?

"A That was around 9 o'clock when we took off, yes, sir.

"Q Then did you fly down the coast?

"A We flew down the coast, yes.

"Q Not up the coast; you flew down?

"A We flew down, made our turn, headed south and came over the coast.

"Q That would bring you then from the gap down left?

"A Yes.

"Q Down by Half Moon Bay?

"A Over Half Moon Bay and south.

"Q About 9 o'clock, when you came down in this area, about how high were the tops of the clouds?

"A At Daly City the ceiling was about 2,000 feet. Then as we headed south we had to continue climbing because the clouds were rising. As we came over the hills there were breaks in there, we could see parts of the ground at times, but nothing definite that you could identify yourself too well.

"Q Were there some holes in the clouds as you would look down?

"A Oh, yes.

"MR. PARKER: I object to the question as to some holes in the clouds. Where? Are we speaking of Daly City or Half Moon Bay?

"THE WITNESS: Half Moon Bay we could see breaks in the clouds where we could see the ground."

6. Plaintiff's Criticism:

The record of what Parker told the jury is at transcript pages 1830–1832.

Plaintiff's criticism is at Salt Lake transcript pp. 43–46.

(a) Counsel criticizes Parker's statement, "Plaintiffs put Mr. Mathews on to establish that all the radio aids to navigation were working perfectly."

Mr. Belli says: "They were working perfectly on that day, and there is no proof to the contrary."

NOTE BY THE COURT: I must agree with plaintiff's view of the evidence which is detailed in the opinion of the Court.

(b) Counsel criticizes Parker's statement, "That in itself wouldn't prove that they were working perfectly in the airplane."

Mr. Belli says: "But there were other witnesses who proved that. We will come to that later on."

NOTE BY THE COURT: The evidence is overwhelming in support of the view that they were working in the airplane,

voice messages were given and received and repeated back by the aircraft pilot to the tower.

(c) Plaintiff's counsel then says: "But listen to this," quoting Parker (SLT 44):

"But he tried to leave us with the impression that everything was working perfectly on the ground—documents, documents, documents."

"I think—and I think the evidence reveals—that Mr. Mathews wasn't too proud of the records they had on those radio aids to navigation, and which this poor pilot was relying on in attempting to come down through that blanket of white to make an instrument approach into the San Francisco Airport."

"I think they have a lot to talk about, a lot to explain."

"When we tie Mr. Mathews' testimony up into Mr. Campbell's testimony you will see the verification of that. I think they are a little bit ashamed."

Mr. Belli: "And there is absolutely no evidence to the contrary." (to what Mathews testified.)

NOTE BY THE COURT: Belli is right. Reasonable men could not disagree.

Moreover, consider Parker's statements: "I think—and I think the evidence reveals—that Mr. Mathews wasn't too proud of the records they had on those radio aids to navigation, and which this poor pilot was relying on in attempting to come down through that blanket of white—I think they are a little bit ashamed."

There is no evidence of this. The witness exhibited no shame or lack of pride.

(d) Parker says: (Records) "which this poor pilot was relying on in attempting to come down through that blanket of white to make an 'instrument approach.'"

Belli says: "And a little later on he will tell you: 'We weren't on IFR; we were on VFR.'" (Instrument flight rules and visual flight rules.)

(e) Referring again to (T 1831), quoted above, Belli criticizes Parker's statement (SLT 44):

"'We take no action on the first report because of the possibility of an error—or should we say, substandard operation of the aircraft equipment.'"

Then: "They know that you have trouble with aircraft equipment."

Belli says (T 45–46):

"I wonder if your Honor has read—and I, flying to San Francisco—from San Francisco to New York—it made me almost want to take the train.

"Ernie Gann, in his last book about aircraft, 'Fate is the Hunter,' explained things in the air, at least according to him, according to the pilot, from the pilot's point of view. You put that into the jury box that men aren't intended to fly, that they are out of their element, that they are up there where God alone only knows what is going on, the dark of night, the billowing clouds—maybe again this aurora borealis with a heaviside layer—we kept that out in this case—would cause something to happen. You put that into the jury box—and I think six of those people didn't fly—and your Honor knows the statistics of the people that fly: So many air passengers compared with so many people in the United States; that that doesn't tell the story because many, many of those people are repeaters. There are very few people out of the whole populace that fly, and you take the average person and ask him about flying: 'Well, that is meant for the birds,' and they are scared to fly—and you throw something into the jury box—

"'They know that you have trouble with aircraft equipment.'

"You bet we know that. You bet we know there are a lot of things that have happened in the skies, a lot of things, when we read the newspaper.

**332**

That is an invitation to substitute passion, prejudice, extraneous circumstances for reasons, relevancies, a specific case in a specific courtroom.

"Again: 'They know that you have trouble with aircraft equipment.' "

NOTE BY THE COURT: Parker quoted only a part of the witness Mathews' statement. He omitted an important part of the same sentence. Moreover, New York defense counsel compound the error in their Memorandum of May 25, 1961, page 17, both in the quotation from "The Record" and their "Comment," where they say: "The remarks of defense counsel are verbatim with the testimony of Mr. Mathews." Well, they were not. Parker blue pencilled the words, "—but we immediately call any aircraft in that area to make a second report," which completed the sentence. The witness' correct statement was (T 148):

> "We take no action on the first report because of the possibility of an error—or should we say, substandard operation of the aircraft equipment—but we immediately call any aircraft in that area to make a second report."

Parker also blue pencilled the whole of the balance of page 148. The result of this is to present the jury with a partial and distorted version of the witness' testimony. It leaves out the follow-up in case the first report is followed by a second. It leaves out the second of the two methods that were used to determine that there had been a failure of the fail-safe facility—namely a ground visit by the maintenance technician. And, it leaves out the following testimony, the force of which is manifest:

> "Q    Did you, personally, on October 29, 1953, receive any reports of any malfunction of any of this equipment that we previously mentioned?
>
> "A    I did not."

Witness was the number one supervisor over personnel maintaining and operating air navigational and air traffic control facilities in the San Francisco Bay area. (T 131). He was the man in charge of seeing that the records and logs of the various facilities were properly maintained. (T 134.)

This abbreviated treatment of the subject follows Parker's introduction, top of page 1831 transcript: "Let's see how the Half Moon Bay fan marker was maintained."

The date of the crash was October 29, 1953. It was near Half Moon Bay fan marker. So, these mis-statements of the record are extremely critical. Parker says: "They know that you have trouble with aircraft equipment."

There was no evidence whatsoever, of trouble "with aircraft equipment," over Half Moon Bay fan marker on October 29, 1953, or any other time. And, there was no evidence that such marker was not functioning properly at the time of the crash, October 29, 1953.

The evidence is to the contrary. A ground technician visited the Half Moon Bay fan marker after the crash on October 29, 1953 and found there had been no trouble with it for at least a week. It was flight checked that day, again and again, and again. No trouble was found.

7.    Plaintiff's Criticism (SLT 46):

Belli says:

"And here we come to a deliberate misstatement made by Mr. Parker, Mr. 'X' and Mr. So and So, talking about a record in a case. Page 1832:

" 'I don't know, maybe British Commonwealth Pacific would have been the next airplane to fly over here and report that it wasn't functioning properly—'

"That is the Half Moon Bay fan marker.

" '—but I don't think it got that far. We know he did not get that far to make any such report.'

"Then he talks about how the Half Moon Bay fan marker:

" 'all these documents—I don't have it here, but the testimony, and all these exhibits can be taken into the jury room with you—the mainte-

.nance record of Half Moon Bay fan marker, as I recall, show it was inspected once a week. No fail-safe device on Half Moon Bay fan marker.'

"That is a false statement, your Honor."

NOTE BY THE COURT: (a) There is no evidence whatever that the Half Moon Bay fan marker "wasn't functioning properly." The evidence is *all* the other way.

Parker is testifying again; he goes on, "But I don't think it got that far. We *know* he did not get that far to make any such report." (Emphasis supplied.)

There is no evidence of this.

(b) Parker gives only a part of the record: "—the maintenance record of Half Moon Bay fan marker, as I recall, shows it was inspected once a week. No fail-safe device on Half Moon Bay fan marker."

The ground crew which inspected Half Moon Bay fan marker after the crash and on October 29, 1953 found it was functioning properly and it had been doing so for at least a week before. The flight crews who, on the day of the crash, checked it from the air, found it was functioning properly.

There is a fail-safe device on the marker. There is standby equipment. If anything goes wrong the facility shifts to the standby equipment. No such shift had taken place for a week, at least, and everything was functioning normally. Parker neglected to tell the jury this. What he did tell them carried strong implications that the Half Moon Bay fan marker was out of order.

8. Plaintiff's Criticism (SLT 47):

Parker says at (T 1832):

"No fail-safe device on Half Moon Bay fan marker. Now let's see about how the rest of these things *were functioning*." (Emphasis supplied.)

Belli says (SLT 47):

"You see, innuendo again. The easy case to try is the desperate case,

nothing to lose. It is like the pilot who has five children and a wife waiting for him at home. He is the man who makes the worst pilot. The unmarried man, the devil-may-care, he is the fellow who will pull up on the stick and go over the hedge at the last minute, so they told us in the last war. And it is so in trying these cases. When you have a case that is clean, when you want to keep a clean record upstairs, to try it against a case where counsel says, 'If we don't have speculation, we have nothing,' where they can do anything in the record, all they want to do is see the plaintiff doesn't win; those are the tough cases to try. But let's continue.

" 'No fail-safe device on Half Moon Bay fan marker.' "

The record is at (T 189):

"MR. GERRY: 'Question: As I understand it, there is a standby equipment at each of these fan markers.

" 'Answer: That is correct.

" 'Question: And there is a fail-safe device so that if one unit goes out, it automatically switches over to the other?

" 'The Witness: That is right.' "

NOTE BY THE COURT: Witness Mathews was the only man who testified on this.

Defense counsel go outside the record in an attempt to shore up their position. (Defendant's May 25th Memo in Opposition, p. 21 and Appendix.)

9. Plaintiff's Criticism (SLT 48): Remember, Parker has just said: "Now let's see about how the rest of these things *were functioning*."

"MR. BELLI: Same page, following right along. Now *counsel is beginning to be airborne and operational*, and they *come a little bit faster*. Quoting Parker:

" 'This is the San Francisco range. Take this in. You can look at this. All the checks were made. *Equipment reported inoperative*.' "

"But that was October 31 that that is said, *not the date of the accident.*"

Belli continues at pages 48–49:

"It may be the 31st of October, but your Honor must read the transcript with reference to that and see the context—this is page 1833."

"—The context with which he says (SLT 48–49):

" 'This is after the accident; but the other entries, you can go through those and see how much difficulty they had with this his equipment . that they are trying to say worked perfectly.' "

10. Plaintiff's Criticism (SLT 49): Parker throws out the innuendo:

"Now let's see about how the rest of these things were functioning."

Parker continues:

"Now, let's go to the outer marker. I am just going to call your attention to a few of these things, ladies and gentlemen."

"On October 4th, 'Operations reported outer marker compass locater inoperative, microswitch in keyer inoperative. Replaced microswitch in THR key in normal (inoperative at 2230 PST, normal at 2330 PST.)' "

Belli says (SLT 49–50):

"Now, he comes down to October 4, 25 days before the accident. And I respectfully submit, on the basis of the Shannahan case, that we shouldn't have allowed that in, your Honor."

"The jury aren't pilots. But when this is thrown at them, they grasp this, 'inoperative'; 'operations reported outer marker compass locater inoperative.' They grasp that, and they grasp that in context with this thing that is set up here: 'They know that you have trouble with aircraft equipment.' And he went into this."

NOTE BY THE COURT: It is pretty clear that the October 4 entry was too remote and should have been excluded.

11. Plaintiff's Criticism (SLT 50): Belli says:

"Now, listen to this at page 1833:

" 'You have entry after entry here. Until you get down to the entry of the 29th everything is working perfectly, so plaintiff is going to tell us.'

"And again at 1834 he then comes down to this Half Moon Bay fan marker. And it isn't counsel overspeaking himself in the exuberance of the moment; it is deliberate, because he has said it more than once, the tracks in the snow coming up to the one object. If it were once, he might have been lost or misled; but if he comes back and back and back, there must be a reason for it. And there was a reason.

"Here we are, 1834:

" 'I grant you most of this equipment was fail-safe, but how about the Half Moon Bay fan marker? Wait a minute until we get to Mr. Campbell's testimony again.' "

12. Plaintiff's Criticism (SLT 50, 51 & 52):

Belli says:

"Then Alicea, at T 1834:"

"Now, let me show you, your Honor, deliberately, what this young boy did on this thing, if I may be permitted to say that, because this is a deliberate mis-statement. 204."

"Maybe if it were said in response to a question that I put or that Mr. Gerry put, counsel could have been confused, may have missed his own notes, but he stands up and tells the jury that Mr. Alicea told them that that plane turned. And he put the question to him: 'Did you hear the airplane continue in the same direction at all times, Mr. Alicea, or did the airplane make a turn?'

" 'Answer: No, it seems to me that the airplane—when he came from the west, went right over us, kind of leaned toward the southeast.'

"And then when he read to the jury, he didn't read that part."

NOTE BY THE COURT: (a) Parker told jury that Alicea testified "he heard the airplane pass over from the west and turn to the southeast."

It is quite clear Alicea testified that the airplane did not turn. When asked "did the airplane make a turn?" Alicea said: "A. No, it seems to me that the airplane—when he came from the west, went right over us, kind of leaned towards the southeast." He thus explains his testimony.

(b) But Parker again made a serious omission. He didn't tell the jury about the last question and answer above.

13. Plaintiff's Criticism (SLT 52–53):

Parker says (T 1836):

"They are trying to pin the whole case, apply a lot of conjecture, surmise, guesswork, on this time element. We will see how exact the times are, now that we know 8:45 isn't exact; it was after 8:45, somewhere around there."

Belli says:

"This is on page 1836. And this we dug out of their own records, that they had determined the time of the accident was 8:44."

"These gentlemen here in their own investigation set the time of the accident at 8:44. And that is another one."

NOTE BY THE COURT: Exhibit 54 was an inter-office telegram from the files of the defendant airline. The case of Pekelis v. Transcontinental & Western Air, Inc., 187 F.2d 122, 23 A.L.R.2d 1349 (CCA–2, 1951) held that sort of document was admissible in evidence.

14. Plaintiff's Criticism (SLT 54):

Parker said (T 1837):

"Plaintiffs would like to have you believe that they positively proved that the airplane was in airworthy condition when it hit the mountain. The engines, the wings, all over the side of the mountain.

"I, too, think the airplane was in an airworthy condition when it hit the mountain."

Belli says (SLT 54) there was a stipulation and an admission that the aircraft at the time of the accident was in an airworthy condition.

NOTE BY THE COURT: Stelmach tells us (T 1838–39),

(1) Aircraft struck side of Mountain initially at 2020 feet;

(2) It was on a heading of about 45° on a northeasterly heading when it struck;

(3) The landing gear was being extended, the main gear was down, and the nose gear was partially down.

Stelmach concluded that the co-pilot had put the landing gear handle into the down position within 15 and 30 seconds. The flaps were down between 15 and 20 degrees.

15. Plaintiff's Criticism (SLT 55–56):

Parker says of Jacobs at T 1839–40:

"He was so conveniently at home in San Mateo and saw this airliner flying low on an approach to landing into San Francisco airport on a clear day, having nothing to do with the case—"

"This has nothing to do with this accident, because we are in a clear day, in the first place."

Belli refers to the record of Jacobs' testimony (T 303):

"Now, Mr. Jacobs, when you testified that you saw these airplanes come low over your house and turn in, that was always under visual flight rule conditions or on a clear day, as we say, where instrument flight rules were not applicable?

"Answer: I don't remember. I wouldn't be too sure of that."

"And that was in answer to Mr. Parker's question."

16. Plaintiff's Criticism (SLT 56–57):

Parker said (T 1840):

"Then Mr. Beckerleg of the United States Department of Commerce,

meteorologist, came in and verified the fact about the weather at that time, that it was completely covered with overcast."

Belli gives us the record:

"Here is Mr. Beckerleg at 309:

" 'The Witness: There was broken cloudiness, bases twelve to fifteen hundred, and higher layer of cloudiness generally above twenty thousand.

" 'Question: Now, this broken cloudiness around the San Francisco Airport?

" 'Answer: That is the official report of the San Francisco Airport, yes.

" 'Question: How about over the hills going towards the ocean?

" 'Answer: There was cloudiness there, but I couldn't officially say whether it was broken or solid. I have no reports over those hills.'

"The only thing we have is Jacobs, who said there were holes as he went out right after the accident.

"But Mr. Parker even put a white sheet over there to show that there was not a hole, or there was nothing but that white sheet of clouds."

NOTE BY THE COURT: (a) Parker misstates Beckerleg, who simply gave the official report of the San Francisco airport. Beyond that he didn't know. (T 309)

"A  That is the official report of the San Francisco Airport, yes.

"Q  How about over the hills going towards the ocean?

"A  There was cloudiness there, but I couldn't officially say whether it was broken or solid. I have no reports over those hills."

(T 311)

"Q  Did this condition prevail after 0800?

"A  At what location?

"Q  Well, over the hills?

"Mr. Parker: Over what hills?

"Mr. Gerry: Coastal hills, including Kings Mountain.

"The Witness: I don't think I could answer that. I don't know that it persisted in that particular area. I only have the reports in the interior section of the Bay. It would be an estimate on my part."

(b) Belli says (T 57): "The only thing we have is Jacobs, who said there were holes," as he went out, on the United flight right after the accident.

(c) Defense counsel point out Capt. Smith's testimony (T 1487–88): He flew over the area of Half Moon Bay the morning of the crash, October 29, 1953 "somewhere between 9 and 9:30."

"It was solid overcast" and he "saw no holes" between 10 miles north of Half Moon Bay to 20 miles south of Half Moon Bay.

17. Plaintiff's Criticism (SLT 57–64):

Parker said, (T 1841–42):

"Then we have Mr. William K. Andrews. *I want you to remember Mr. Andrews. Mr. Andrews had been chief of the Accident Investigation Division of the Civil Aeronautics Board for many years,* and he was finally, I believe for several years prior to his retirement, Director of the Bureau of Safety of the Civil Aeronautics Board. *He was with the board in 1953 and knew all about this accident.*

"*They put Mr. Andrews on the stand,* ladies and gentlemen. *What did they ask him? To identify a document,* which we will go into later, a document which was a further attempt to confuse you.

"*Did they ask Mr. Andrews anything about how this accident happened? There is Mr. Aviation Investigation of the United States,* retired from the Board, Director. *He knew all about this accident. Do you know why they did not ask Andrews any question?* They had to bring Mr. Brand out. We will go through his testimony in a min-

ute. *Because Mr. Andrews wouldn't tell you what they want you to think the facts were in this case. He would tell you the truth. He would tell you* that no one knows how this accident happened, that the pilot, in attempting to go into San Francisco, deviated from his let-down. *He thought he was in the proper place, and he wasn't, in fact."* (Emphasis supplied).

Also at page 1845 Parker repeated: "I say why didn't they ask Mr. Andrews these questions? I told you why they wouldn't ask Mr. Andrews these questions. Because Mr. Andrews knows the answers."

Mr. Belli, plaintiff's counsel severely criticizes Parker here. He says (T 57):

"Now, we come to page 1841. Here, your Honor, is the *Civil Aeronautics Board accident investigation report.* I stuck this under the desk so I wouldn't be tempted to use it, breathe it, mention it, to even consider it. *I can now.* I could now justiciably, *on a motion to hold counsel in contempt from his own words that he was an officer of this court and he is bound to speak the truth*—and I submit to you that it is contumacious for counsel in argument to try to infer to the jury that a paper which he has in his hand is something different from what it is, deliberately to tell the jury that this is the fact when he knows, unequivocally, that it is not.

"Here is the accident investigation report, and I put it into this record in this argument legitimately now for the purpose to show how deliberately this gentleman attempted to prejudice and mislead this jury. And if this jury were sitting in that box now and could hear my words, I think they would bow their heads in shame and they would have the mixed emotion of being furious of what this man did. And here it is. Here is the accident investigation report as to how this accident happened.

"And do you know, your Honor, who was head of the Civil Aeronautics Board accident investigation report, who was the head over the whole United States at that time? It was Mr. Andrews, whom we put on the witness stand.

"There is a rule of law, though, that I can't ask Mr. Andrews what happened when he investigated the accident. I can't ask him: You were an expert; you were the No. 1 expert—as Mr. Parker is going to tell you right now—You are No. 1 expert in the United States then and now, but I can't ask you what happened, because the law says this report can't go into evidence. * * *

"* * * If we are estopped from introducing a report for its substantive or probative value, we are not estopped from saying that *counsel is contumacious as an officer of the court in deliberately expressing something falsely to the jury.* And therefore I'm going to ask that this accident investigation report be offered into evidence for your Honor's consideration on this motion for a directed verdict and n. o. v. And I read just the end of that report now in view of what he told this jury:" (Emphasis supplied.)

"'FINDINGS: On the basis of all available evidence the Board finds that: (1) the carrier, the aircraft, and the crew were properly certified according to the appropriate regulations of the Australian Government,

"'(2) The aircraft was loaded to a weight less than its maximum amount and the center of gravity was located within prescribed limits,

"'(3) Propeller relay difficulty was eliminated shortly after takeoff and the flight from Honolulu to Half Moon Bay fan marker was otherwise uneventful.

"'(4) The clearance given the flight for its instrument approach to San Francisco Airport was proper and

was acknowledged and was read back correctly.

" '(5) The radio navigational landing facilities for this area were functioning normally at the time this approach was made.

" '(6) The accident location was in **a** mountainous area seven and a half miles south of Half Moon Bay and at an elevation of 1950 feet MSL.

" '(7) The weather conditions in the area precluded an approach by means of visual reference to the ground.

" '(8) The time element involved would not have permitted the aircraft to have flown from Half Moon Bay fan marker to the ILS outer marker and then execute the CAA approved instrument approach procedure.

" '(9) The undestroyed wreckage yielded no evidence of mechanical or structural failure of the aircraft prior to impact.

" 'PROBABLE CAUSE: The Board determines the probable cause of this accident was the failure of the crew to follow prescribed procedures for an instrument approach.'

"Now, that is the record at the time that Mr. Andrews was head of the CAB investigation.

*"Now, let's see what this officer of the court told these ladies and gentlemen of the jury.*

"At page 1841. Knowing that our lips were bound, indecency, inethical advocacy, *not to hurl the lie back, this he told the jury, knowing what was in this report, 1841:*

" 'Then we have Mr. William K. Andrews. I want you to remember Mr. Andrews.'

*"And he should long remember Mr. Andrews."* (Emphasis supplied.)

(At this point Mr. Belli read Mr. Parker's statement, above, about Andrews from transcript at both page 1841 and page 1845.)

"Then we have Mr. William K. Andrews. *I want you to remember Mr. Andrews. Mr. Andrews had been chief of the Accident Investigation Division of the Civil Aeronautics Board for many years,* and he was finally, I believe for several years prior to his retirement, Director of the Bureau of Safety of the Civil Aeronautics Board. *He was with the Board in 1953 and knew all about this accident.*

*"They put Mr. Andrews on the stand,* ladies and gentlemen. *What did they ask him? To identify a document,* which we will go into later, a document which was a further attempt to confuse you.

*"Did they ask Mr. Andrews anything about how this accident happened? There is Mr. Aviation Investigation of the United States,* retired from the Board, Director. *He knew all about this accident. Do you know why they did not ask Andrews any question?* They had to bring Mr. Brand out. We will go through his testimony in a minute. *Because Mr. Andrews wouldn't tell you what they want you to think the facts were in this case. He would tell you the truth. He would tell you* that no one knows how this accident happened, that the pilot, in attempting to go into San Francisco, deviated from his let-down. *He thought he was in the proper place, and he wasn't, in fact."*

(Emphasis supplied.)

Also at page 1845 Parker repeated: "I say why didn't they ask Mr. Andrews these questions? I told you why they wouldn't ask Mr. Andrews these questions. Because Mr. Andrews knows the answers."

Belli continues (SLT 62–64):

" 'I say why didn't they ask Mr. Andrews these questions?'

"We didn't ask him because we were being ethical advocates, and *the law says we can't.* And we would have been disentitled to continue. Your

Honor could have given a mistrial against us if we had asked that question.

"Now we ask your Honor to consider what happens to us when we remain ethical advocates, and they, with a desperate case, do what they did here.

" 'I say why didn't they ask Mr. Andrews these questions? I told you why they wouldn't ask Mr. Andrews these questions. Because Mr. Andrews knows the answers.'

"You bet he knows the answers, and this is the answer when he was head of the Board:

" 'The Board determines the probable cause of this accident was the failure of the crew to follow prescribed procedures for an instrument approach.'

"That sentence with nothing more, I submit to your Honor, we would be entitled as a matter of law—that is an intent to violate a navigational rule under the Sullivan authority—which there is more. That is willful misconduct sufficient to entitle us to an n. o. v. or directed verdict and there is no explanation by them as to why he didn't do this.

"This is in the Board report. We don't rely on that in evidence, but we proved that.

"They knew what was in this report.

"So this jury went out with that ringing in their ears. Mr. CAB himself. What is that again? Yes, 'There is Mr. Aviation investigation of the United States.'

"I remember the story that is told us in law school, told us what not to do. Old Senator Sam Shortridge, I think, had someone on the stand and he put the question to him—only one question of the principal government witness: 'Why, Mr. So-and-so, did you leave Salt Lake and come to San Francisco?'

"And the poor fellow stuttered. He couldn't give a legitimate answer.

He had been in Salt Lake for about ten minutes passing through. He couldn't give a reasonable answer as to why he left Salt Lake, but Sam, in that manner that was used in the old days in advocacy, said, 'That is all.' And he turned around and sat down in his chair. And the jury looked at each other. The principal witness of the government; why was he forced to leave Salt Lake? Here is what rang in their ears.

"Well, that is 1841."

The Civil Aeronautics Board accident investigation report is Exhibit (1).

NOTE BY THE COURT: Defense counsel respond in their May 25, 1961 Memo in Opposition to Plaintiff's Motions at pages 28–29. (a) They say, "Mr. Parker did not hold a paper in his hand and imply that he held the CAB report."

What Belli said was: "I submit to you that it is contumacious for counsel in argument to try to infer to the jury that a paper which he has in his hand is something different from what it is, deliberately to tell the jury that this is the fact when he knows, unequivocally, that it is not."

Whether Belli was speaking figuratively and not in a literal sense is minor compared with the charge he levels of bearing false witness before a jury.

(b) New York defense counsel say Mr. Andrews was never a chairman of the CAB: was not head of the Accident Investigation Section "at the time of this accident or during the course of the preparation of the CAB report thereon," and "did not participate officially in the investigation by the Board of this accident." It would appear that New York counsel and Parker ought to get together. Parker told the jury that Andrews "was with the Board in 1953 and knew all about this accident." He also said: "There is Mr. Aviation Investigation of the United States himself." And, repeated, "He knew all about this accident." And, again on page 1845 Parker told the jury, "Mr. Andrews knows the answers."

If what New York counsel says is true, all Mr. Andrews knows about the accident is hearsay and not admissible. The Court has not overlooked the innuendo in the word "officially" in New York counsel's statement: "Nor did he participate *officially* in the investigation by the Board of this accident."

The record (T 348) shows the following examination of Mr. Andrews:

"Q Did you know of the accident of BCPA at or about Sierra Morena, inshore of Half Moon Bay, on or about 29 October 1953?

"A Official notice came to me—

"Q Well, now, you can't talk about the "official." You just have to tell us.

"A It came to me in my position."

If it came to him only in his official position, he couldn't testify. And, of course, Andrews would not have been permitted to tell what was in the report of the accident or its investigation. Not only would it not have been the best evidence, and hearsay, but former Section 701 of the Civil Aeronautics Act of 1938 would have excluded it.

The record shows (T 347) that Andrews had been Chief Investigation Section, Chief Investigation Division, Assistant Director, and finally Director of the Bureau of Safety Investigation, CAB. And that he was with the CAB in 1953.

(c) New York counsel, in their Memo page 29, say, former Section 701 "does not preclude a Civil Aeronautics Board investigator from testifying as to facts observed by him in investigating an accident."

Andrews was no "employee" or "investigator," as we have seen.

There isn't any evidence at all that Andrews ever personally investigated the accident. His testimony at (T 348) is to the contrary. New York counsel again compound Parker's conduct.

(d) Finally, New York counsel, at page 29, say Belli's assumption that defendants would have objected to the introduction of the report is "naive, to say the least."

Well, that is precisely what Parker did in two previous trials arising out of this same aircraft crash, before the same judge who tried this one.

Belli had had some experience upon that subject.

18. Plaintiff's Criticism.

Belli says (SLT 68):

"I would like again to reiterate our stand that we are going into the misconduct of counsel and going tediously through this record because this is a case now of an evidentiary insufficiency, and that our motion is for directed verdict and an n. o. v., not what could be produced at another trial at another time or what was produced at another time before this one.

"The tomb is sealed on this case and the findings are in there, and that is what we are exploring presently. And again this question, just this one sentence, to set us back as to what exactly we are going through this record so tediously for: 'The rule is settled for the Federal court and for many of the state courts that whenever in a trial of a civil case the evidence is clearly such that if a verdict were rendered for one of the parties, the other would be entitled to a new trial, it is the duty of the judge to direct the jury to find according to the views of the Court.'

"And that is Pennsylvania [Railroad Co.] [v.] Chamberlain, 288 U.S. 333 [53 S.Ct. 391, 77 L.Ed. 819]."

NOTE BY THE COURT: (a) Counsel asks: "What did they show?" "What evidence have they got?" And, answers: "They have none."

Belli then compares defense theory of the case at the first trial in San Francisco with this one: He says, in the first trial when Mr. Wallace "let his hair down," when the Court asked him what he had, Mr. Wallace answered: "If we

don't have this speculation, we don't have anything."

Belli then asks: "Now, what did they have in this trial?" He refers us to the trial transcript pages 1276–1285; 1322–1328; 1331–1338. And, he says, "This is the essence, and this is right down to the nub of the thing."

The first trial, speculation, "and if we haven't got that we haven't got anything."

"What do they do in this trial?"

"They bring in an overlay. Your Honor asked Mr. Parker what he was going to do with that celluloid overlay."

"And you told him and cautioned him not to use that overlay. And he took it down on objection by Mr. Gerry.

"But when it comes to argument, as we shall see here, then he stood in front of the jury without the celluloid overlay and did by word what your Honor wouldn't let him do by the demonstrative evidence of the celluloid overlay.

"There is the plan set forth from that page. We are concerned because that is their theory of this case."

(b) The discussion of the overlay is important. It points up the weakness of the defendant's case. The colloquy to which Mr. Belli refers is, therefore, outlined here.

Mr. Gerry at pages 1276–1282 spoke to his objection to an offer of proof. Then the Court said:

"THE COURT: I am interested in your telling me what you are going to do with that overlay."

"THE COURT: Mr. Parker, in order to move that overlay down there now where you say he was just making his turn to go into the airport and was deceived in where he was when he was heading into Kings Mountain, in order to do that, how many things would have had to have been malfunctioning or out of order or sending false signals or swinging around like garden hoses, and that sort of business?"

"THE COURT: I know what your ultimate hope is in the proof, but let's get back to what facts do you start with and what inferences are going to be drawn in order to arrive at the point I allow you to put that overlay down and say to the jury what you have just said to me?"

"Now, what facts are you going to draw that from?"

Then Mr. Parker said, "We know the airplane made a turn in that area, your Honor."

"MR. PARKER: We have evidence in this record that if there was miskeying that you would get the outer marker signal at the Half Moon Bay marker. That is one test."

"MR. GERRY: What?"

"THE COURT: What about that?"

"MR. PARKER: That is in the evidence.

"THE COURT: What is the evidence?

"MR. PARKER: If there was miskeying you would receive the outer marker signal at the Half Moon Bay fan marker.

"THE COURT: Whose testimony was that?

"MR. PARKER: Captain Lucas, and cross examination by Mr. Gerry on Friday.

"MR. GERRY: What?

"THE COURT: Show us that in the transcript."

Mr. Gerry refers to the American Law Institute Model Code of Evidence, Rule 103:

"Discretion of Judge to Exclude Admissible Evidence:

(1) The judge may in his discretion exclude evidence if he finds that its probative value is outweighed by the risk that its admission will

(a) Necessitate undue consumption of time, or

(b) Create substantial danger of undue prejudice or of confusing the issues or of misleading the jury."

And, Gerry says:

"And under the Comment it puts forward exactly what we have been talking about here:

" 'This rule finds constant application when circumstantial evidence is offered. Wherever a matter is offered as the basis of an inference as to the existence or non-existence of a fact in dispute, and the matter is itself in dispute, an additional issue is raised. Often item A, when offered as tending to prove the existence of alleged fact D, will serve only as a basis for an inference of the existence of B; and if B is inferred, it will in turn serve as a basis for the existence of C and C likewise for D. If the probative value of A is slight, and it will require much time to hear the evidence for and against its existence, several difficulties may arise: (1) The time to be consumed may be out of all proportion to the value of the evidence; (2) The contest over the existence or non-existence of A may mislead the jury into believing it an issue of major importance; (3) The evidence as to the existence or non-existence of A may present such a number of subordinate issues as to confuse the jury.'

"And I think, your Honor, that we have here something that falls into two of these matters: First, for us to go into all of the theoretical background of all of the navigational aids here, then to go back and hunt through all of the documents and present the reams of documents we would need to show changes or lack of changes, to show that the circumstances were the same as at the times that these witnesses testified they found certain aberrations, would certainly necessitate an undue consumption of time and would also '(b) create a substantial danger of confusing the issues or of misleading the jury.' "

"As a very good example of that, I would like to read to your Honor what Mr. Parker was talking about just before we knocked off for lunch. (T 1285). This is found at page 1063 when Mr. Parker said that there was evidence of miskeying of the Half Moon Bay Fan Marker, and it was on this that they could predicate moving this overlay down on this chart. This is the evidence, your Honor, my questions on cross-examination to Captain Lucas: (T 1063)

" 'Q Just so we are clear, this fan marker never lights a blue light, does it?

" 'A Not to my knowledge, it shouldn't.

" 'Q This fan marker never gives a consistent series—a continuous series of dashes, does it?

" 'A A continuous series of dashes?'

" 'Q It gives da da da da da da?

" 'A If there was any miskeying, there would be a continuous series, if.

" 'Q You never heard it.

" 'A I never heard the Half Moon Bay marker give a continuous series of dashes.'

"THE COURT: Is that all that was said about miskeying?

"MR. GERRY: That's correct.

"MR. PARKER: That's all.

"THE COURT: You say there is evidence of miskeying?

"MR. PARKER: No, I didn't say there was evidence of miskeying, if the Court please. I said there was evidence that if there was miskeying that Half Moon Bay fan marker would give a continuous series of dashes.

"MR. GERRY: But there is no such evidence.

"THE COURT: Well, read that to me again.

"MR. GERRY: (Reading)

" 'Q It gives da da da da da da?

" 'A If there was any miskeying, there would be a continuous series.

" 'Q You never heard it.

" 'A I never heard the Half Moon Bay marker give a continuous series of dashes.'

"The only evidence about this in the record is that, if there is miskeying, it switches to the other station automatically, the other thing that is there. They have dual functions at the Half Moon Bay fan marker, and the evidence by Mr. Mathews and other people, in the record, is, if it misfunctions at all, it switches over to the standby equipment. That is the evidence on miskeying, your Honor."

Gerry continues:

"There was a plane that flew over ten minutes before. Everything was normal. There was a plane that flew over within two hours after. Everything was normal. All of the records show everything was normal.

"We believe, with that mass of evidence of normality or normalcy, that it then becomes incumbent upon the defendants to attempt to show more than a single instance far removed in order to get these matters before this jury. We don't say that it is an impossibility to have—"

"MR. MAGNER: Do you say there is a possibility?

"MR. GERRY: Well, your own witness, Mr. Magner, says that it is a *practical impossibility* for this accident to happen because of putting together wavering range legs, fan markers that are out of place AIF needles that swing all at the same time, which is what you would have to do in order to have this accident happen the way I contend you are going to tell the jury it happened.

"MR. MAGNER: I just stated that your position was that it was impossible for the pilot to have received false information. Is that your position, or do you concede that it is possible to receive false information? Which is your position?

"MR. GERRY: We concede that it is a *highly remote possibility* that this pilot may have on this day received some minor items of false information. We say further that this is *highly improbable* and that the *great probability, from all of the evidence,* is that he did not receive any misinformation.

"We say further that it is *practically impossible,* although still a possibility because anything is possible in this life, for him to receive three or four or five items of misinformation all at the same time which would mislead him into making a letdown in that area, and I again say in this regard that we feel we are entitled to your theory of this case and that, if this overlay is going to be moved down here to the Half Moon Bay fan marker in front of this jury *when all of your own witnesses say that that fan marker could not be mistaken for that ILS outer marker,* then I think we are entitled to know about it now and I think we are entitled to argue to his Honor about that." (Emphasis supplied.)

The record shows (T 1334):

"THE COURT: This is pretty close to the thing I am interested in. Are you folks going to move that overlay down so that what appears on the overlay as the ILS outer marker, will be moved down so that it is where the Half Moon Bay fan marker is located? And then are you going to argue that this group of circumstances may have all happened at the same time so that at this moment he would have gotten that ILS signal at the Half Moon Bay and would have gone into his procedural turn? Is this what you are going to say?

"MR. MAGNER: I don't think it follows, your Honor, that the argument necessitates an assumption that everything failed at once at all.

"THE COURT: Are you going to argue that?

"MR. MAGNER: We are certainly going to argue the possibility of misinformation being given to the pilot and of confusion to the pilot.

"THE COURT: Maybe you got that ILS signal down at the Half Moon Bay fan marker?

"MR. MAGNER: We can't argue that he got it or that he couldn't get it. We were going to show the possibilities, through an expert, of the propagation of these signals. It isn't a strong probability."

The Court then says (T 1336–1338):

"Well, I will tell you what it looks like now, tentatively, to me. It looks like you folks have got some material here that you are offering in evidence which is, to say the very least, very remote. If it weren't very remote, if all these things could happen in combination and adversely, as is being suggested in the argument, how does one ever fly an airplane into the San Francisco International Airport? How is it that during closed in, heavy fog and overcast conditions there is traffic going in and out of that airport all the time? Instrument flying is ordinary procedure there. ILS landings are ordinary procedure there.

"If the inferences which you folks are suggesting to me and which you are going to suggest to the jury are to be taken as having any value at all, one's next inquiry is: Well, no one should ever operate a plane in that area with these facilities, these possibilities, with all of this misleading stuff that is going on all the time, range lights whipping around, ILS markers giving deceptive information, the various other things that you folks have been referring to.

"One after another of these radio aids has been criticized. The imperfections are being, I think, emphasized beyond the reasonable inferences that can be drawn.

"A fairly reasonable inference, if the jury thought it were a fairly reasonable inference, is a permissible inference. But to have suggestions of the type that are now implicit in the moving of that overlay—let's take the whole works, imperfections and all—down to the Half Moon Bay fan marker and suggest that all of these phony signals one way or another combined, it was a coincidence of them, and that the fellow went off into Kings Mountain because of that seems to me to be a very remote sort of thing.

"Secondly, it seems to me that the inference upon inference upon inference is based upon no fact at all. Somewhere back there there must be a fact from which the inferences and the chain of inferences can be started.

"And, thirdly, it seems to me that the chain of inference is broken.

"And, fourthly, it seems to me that we are running into a lot of collateral issues and it may take us weeks to try those collateral issues.

"And, fifthly, it seems to me, without any question at all I am persuaded, that this kind of thing can mislead and confuse that jury."

19. Plaintiff's Criticism (SLT 71–73): Belli says, page 71:

"This was a rather diabolical thing because they were trying to show that the Half Moon Bay signal could be confused with the Belmont signal, which it couldn't. But listen to this. At page 1857 this is what we have. 1857. This is what Mr. Parker reads to the jury:"

"Then we have Mr. John Campbell, CAA, the pilot that flew over this area. * * * He told us he was on the way from Bakersfield about 9 o'clock, and on the way up he was called to go over and check these facilities.

"You will remember something very important. He did not check Salinas. The northwest leg of the Salinas range determines the position of the intersection on the Half Moon

Bay on the southwest end. He did not check that. He told us the checks were completed between 1 and 1:30. I will get his exact words, in Vol. 6.

"'Q On this flight did you experience any interlocking between the Belmont and the Half Moon Bay fan markers?

"'A As I recall, at certain altitude and location we got a heterodyne audio between the two facilities.

"'Q What is a heterodyne audio?

"'A That is the beat of the two facilities.

"'Q Would this be observable as either the Belmont or the Half Moon Bay fan marker?

"'A Yes, that is right.

"'Q In other words, would it sound the same as the Belmont fan marker?

"'A It would depend on location. If you are closer to one than the other, then you could possibly identify the closest facility.'"

"MR. BELLI: Page 1857. He is trying to argue that they could confuse the Belmont and the Half Moon Bay, and this is what he says, purporting to read from the record in front of that jury, as he says, an officer of the court. He reads:

"'Question: Would this be observable as either the Belmont or the Half Moon Bay fan marker?

"'Answer: Yes, that is right.'

"But here is the record, and the record is the negative, at T 759:

"'Question: Would this be identifiable as neither the Belmont or the Half Moon Bay fan marker?

"'Answer: Yes, that is right.'

"MR. BELLI: 1857 is what Mr. Parker says the record is, and he states it affirmatively. But the reporter's transcript that he is supposed to quote from and is supposed to be reading from, he deliberately misquotes, and it is at page 759.

"MR. BELLI: And it changes the meaning completely."

"MR. BELLI: And when we read it, we can see that it states the meaning that he wants to show, that the Belmont fan marker and the Half Moon Bay fan marker simulate each other, whereas the witness testified they would not."

And Belli said, page 92:

"And you can't tell me with those two other questions and answers, that the reporter made the mistake on this. This was deliberate, and this goes back to where he first quoted that."

20. Plaintiff's Criticism (SLT 73–75) (T 1001):

"BELLI: Now the one in which Mr. Parker testified to the jury—in oral argument, page 1001:

"'Q Captain Lucas, what was the primary frequency that you called San Francisco approach control on in 1953?

"'A 3105, both for transmission and reception.

"'Q And if you couldn't receive them on 3105 on both transmitting and receiving, then what frequencies would you attempt to contact them on?

"'MR. GERRY: I object, your Honor.

"'THE COURT: Overruled.

"'A 278 kilocycles was one of the secondary frequencies for reception by the aircraft of tower transmissions. That is for our operation, of course.

"'Q Then an aircraft calling back on 3105 and receiving on 278, that would be a second call to San Francisco approach control, would it not?

"'MR. GERRY: I object to that as calling for a conclusion of this witness about a fact not in evidence.

"'THE COURT: It is highly suggestive and leading.

"'MR. GERRY: Certainly.

" 'THE COURT: Objection sustained.

" 'You are really testifying, Mr. Parker, in that question.' "

BELLI: "And that was your Honor to Mr. Parker. And, Mr. Parker then, for that testimony that he gave, put that in the record as Mr. Lucas' testimony. And here it is:"

"Do you remember what Captain Lucas said about 3105 and 278? It was a second frequency. In other words, *he tried his first frequency and could not make contact.*" (Emphasis supplied.)

"MR. GERRY: Objection. There is no such testimony in the record here. In fact, the testimony and the evidence is to the contrary."

"MR. PARKER: I will continue, ladies and gentlemen. We will find Captain Lucas' testimony to that effect and we will read it to you."

Belli then says that Parker substituted his own, unsworn testimony when he told the jury, "In other words, he tried the first frequency and could not make contact."

NOTE BY THE COURT: (a) There is no testimony in the record that, "In other words, he tried his first frequency and could not make contact," as Parker told the jury.

As the record above discloses objection to his question aimed at showing that was sustained.

It is surprising that, again, New York counsel should leave out this part of the record in their Memo of May 25, 1961, page 34.

21. Plaintiff's Criticism:

Despite the fact that the court told defense counsel the matter was "wholly immaterial" and that the court sustained Mr. Gerry's objection to the question, (T 1124), Parker went right ahead (T 1845) and told the jury: "I don't blame anybody for not wanting to admit why they left, or why their employment was terminated."

The record at T 1124 is:

"Q Are you familiar with the circumstances of the termination of his employment with Overseas National Airlines?

"A Yes, sir.

"MR. GERRY: I renew my objection.

"THE COURT: Wholly immaterial. Objection sustained."

Parker told the jury, "Mr. Walter Brand I have known for a long while. I liked him very much."

Belli says: "The adroit kiss, and now comes the assassination: 'He was a little inaccurate in some of the statements he made'—and I think this is assassination. There is no opportunity to defend oneself, particularly after your Honor admonished him not to go into any question of firing. And, he didn't put the question to him."

Parker went on and said: "We don't like to bring things like that in, ladies and gentlemen, but we have to know the truth."

"The word 'truth' is written on the page as though it didn't stick in counsel's throat when he was saying that. And I don't think that I overstate myself when I put that to your Honor in that rather dramatic manner."

"And, at 1845: *'I say why didn't they ask Mr. Andrews these questions?'*

"He is sailing high again.

" *'I told you why they wouldn't ask Mr. Andrews these qusetions. Because Mr. Andrews knows the answers.'* " (Emphasis supplied.)

"And, oh, but that jury could have heard the answers from Mr. U. S. Investigation himself. But we were ethically bound not to tell the jury what the CAB had determined."

22. Plaintiff's Criticism (SLT 78):

"BELLI: I am concerned with trying to ferret out from their argument what is their contention and what is the rebuttal against our evidence *that this man didn't go over that outer marker and had to know*

*that he didn't go over that outer marker before he went into the clouds."*

"Now, here he comes to something, after disposing of Brand and Andrews, that is more to the essence of the n. o. v., and that from the law:"

Parker at pages 1845–6 of the record:

"Mr. Brand's testimony was a long, lengthy testimony. Let's see where we get any evidence of wilful misconduct—not misconduct, but wilful misconduct, an intent to do an act, knowing that *in all probability* it is going to result in *this injury*, with *complete disregard of that probability."* (Emphasis supplied.)

Belli, at page 78 again:

"He has now overstepped the conjunction. *He has* allocated it to the *specific intent for this injury,* and he has given it modification, that, too, he must *completely disregard that* probability of *this* injury. And that is on page 1846.

"I think we must ultimately come down and ask again and again: What is their theory? What have they? That is the purpose, that is the function, of directed verdict which was taken under advisement, as it says in this case, that we are relying on here. Such a practice, that is, a directed verdict, not only saves time and expense but gives scientific certainty to the law and its application to the facts and promotes the ends of justice." (Emphasis supplied.)

23. Plaintiff's Criticism:

On the question whether the BCPA aircraft had a VAR aboard, which could have been used as a localizer:

Gerry said, in the answers to the requests for admissions, defendants admit that they had a VAR receiver on their aircraft. Also, Captain Lucas of BCPA testified, (T 1145–1146):

"Q You had a VAR receiver on your aircraft, did you not?

"A Yes.

"Q And the VAR receiver, if it has the frequency, is the same as the localizer course receiver for the ILS system, is that right?

"A The receiver is the same type of receiver, yes, sir.

"Q So that you would have in your aircraft the little needle that would swing from one side to the other in the center line, right?

"A That's right, a deviation indicator.

"Q And if you had this instrument tuned to this localizer course at the San Francisco ILS system, and you were coming along this path from Half Moon Bay to the ILS outer marker, which way would the needle be pointing, which side of the dial would it be on?

"A With the equipment we had at that time, Mr. Gerry, I would not like to answer that because it was not checked out actually for ILS equipment.

"Q If tuned, it would be on the left-hand side, would it not?

"A If it was correctly tuned and checked out for ILS equipment.

"Q As soon as you passed over the localizer course, you would pass over to the other side, right?

"A Yes.

"Q So it could, if tuned, provide you another check as to when you passed over this area, right?

"A Yes. I think the indications would be reversed actually.

"Q I think you are right, it would be right first and then left?

"A Yes."

And again, at T 1049, "we did have a localizer in the aircraft. The actual equipment was in the aircraft for the use of the VAR equipment that was in service and still is in service in Australia. It did cover the frequency range of the instrument landing system at San Francisco, or the receiver did, not the VAR

equipment. But the pilots were not licensed to use it and the equipment was not checked out for ILS work."

And again at T 1155–56:.

"Q Captain Lucas, when Mr. Gerry was examining you he stated that a localizer in an aircraft would give you another indication that you would receive signals from the outer marker.

"A Yes.

"Q And I ask you this: Were your planes equipped to use a localizer at San Francisco Airport in October of 1953?

"A They carried the equipment, but they were not licensed to use it, the pilots, nor was the airline, nor was the equipment checked out for ILS, instrument landing system."

Mr. Gerry then tells us, page 81:

"MR. GERRY: That is the localizer, of course, that their own captain testified they had aboard the aircraft.

"The difference is that on the ILS, of course, you have both the localizer course and a glide slope.

"The only thing they didn't have in this aircraft was a glide. All that Captain Brand said was they did have this other check aboard the plane if they cared to use it going across from the Half Moon Bay fan marker as an additional check when they went across. He didn't say they were required to use it or that they did use it, but it was available for their use if they wished to use it. *And there is no dispute in the record by anybody except Mr. Parker where he says that they were not qualified to use it in the United States.*" (Emphasis supplied.)

24. Plaintiff's Criticism (SLT 82–84):

Belli, page 82:

"And then over on 1849 we go to the outer marker question.

"'And don't let them confuse you by saying passing over the outer marker. He was flying over a blanket of white. He couldn't see the outer marker. It has nothing to do with the geographical position. It has to do with receiving signals; the state of mind—when the man thinks and believes he is over the outer marker.'

"May it please your Honor, it does have something precisely and definitely to do with the geographical position, to wit: It has to be in one place and it doesn't go in any other place, and no one has any evidence at any time that that outer marker changed. And they didn't even try to produce any evidence that the outer marker did change. So it is a geographical position.

"And I think that this paragraph is very significant. If you allow someone in the airplane to say that he thinks he is over the outer marker when he is nowhere near the outer marker, then you will allow his thoughts to dispute physical facts, and physical fact is that the outer marker is geographical. You have a red light at an intersection. You have someone that comes up to that intersection in a car, he sees that red light, the red light is working. You can't go into his mind as to his intent. If we had to have an admission and a confession from the live as well as the dead, there would never be anyone in any of our prisons.

"But we have proved in this case that that outer marker was a geographical position. It was at one place. It gave three checks. And we proved, even without the presumption of due care on the part of the people on the plane, we proved that those people in the plane, if they were looking, with their plane functioning as it should have been functioning at that time—and there is no evidence to the contrary—they couldn't have let down until they got to that geographical position. But he tells the jury that it is not a geo-

graphical position, and if he was confused and let down someplace else, then we haven't proved our case.

"But he couldn't have been confused if it is a geographical position and if it set out those marks like the red light at the intersection and like the man perceiving it when he comes up to there.

"I think that this paragraph is significant at 1849:

" 'And don't let them confuse you by saying passing over the outer marker. He was flying over a blanket of white. He couldn't see the outer marker. *It has nothing to do with the geographical position.* It has to do with receiving signals; the state of mind—when the man thinks and believes he is over the outer marker.' " (Emphasis supplied.)

"That is a very salient thing."

" 'Mr. Brand tried to tell you that they had three checks—four checks; that they had the compass locator needle following in. When you get a swinging needle, that means you are overhead. Also the light, the flashing light. Also the signal. The same code as that. And also this localizer.

" 'You heard Captain Lucas and Captain Smith. Two out of three checks. Either the light or the aural signal and the radio compass.' "

NOTE BY THE COURT: Brian, early English judge, "The thought of man is not triable; the devil himself knoweth not the thought of man." Williston on Contracts, 3rd Edition, Volume 1, Section 22.

25. Plaintiff's Criticism (SLT 90).

Belli says without the facts, and outside the record "comes this argument from counsel at 1855:

" 'In this case you were transmitting on 3105 and receiving on 278, the second frequency, which indicates to me he had made his call on the prime frequency, and had to go to the secondary frequency. You had

the record of Oakland approach control, where the radio transmissions were very weak or very poor.

" 'So we don't have any positive evidence of time.' "

Belli also says Parker ignores the inter-office telegram fixing the time of the crash at 8:44.

NOTE BY THE COURT: Parker: "Which indicates to me he had made his call on the prime frequency and had to go to the secondary frequency."

Unsworn, not under oath, testifying outside the record.

There is no such evidence in the record.

26. Plaintiff's Criticism (SLT 92):

Belli says:

"Now, to go along on page 1857, Parker tells the jury:

" 'Taking Mr. Campbell's testimony further, you will recall that I asked him if he could determine the geographical location of these radio waves—the southwest leg of the San Francisco range, the fan marker, and so forth; if he could determine if he was receiving these signals exactly in their geographical position, and he admitted no.' "

"MR. GERRY: The record on page 777 shows the following, questions by Mr. Parker:

" 'Question: Then, you had no way of determining where that on-course signal was in relation to the ground underneath the clouds?

" 'Answer: I think we determined that the same day before we left when the stratus cleared out.

" 'Question: Did you make two separate flight checks on this, Mr. Campbell?

" 'Answer: I think we made several because we spent two or three hours in that vicinity. We were going back and forth constantly.

" 'Question: Are you positive right now that you went out and checked the southwest leg of the San Francisco low frequency radio range

when there was no stratus over the Half Moon Bay area?

"'Answer: I would be for this reason: That is part of the job and we would have to do it.'"

Mr. Belli: 1857, quoting Mr. Parker: "Then plaintiffs, in attempting to clean it up, had him testify that later on in the afternoon when the fog disappeared, he could."

27.   Plaintiff's Criticism (SLT 94):

Belli, quoting from Parker:

"Those are the plaintiffs' witnesses. Ladies and gentlemen, where is any evidence of wilful misconduct, the intent of this pilot to let down through the overcast in this area, the area of Kings Mountain down here, the intent to make a letdown in this area, *knowing* that in *all* probability he was going to *fly into the side of the mountain?*" 1858. (Emphasis supplied.)

"There was a further attempt to confuse you and speculation and guesswork. The plaintiff begins grasping at straws."

NOTE BY THE COURT:  "* * * knowing that in *"all* probability he was going to fly into the side of the mountain,"* is a misstatement of the law.

28.   Plaintiff's Criticism (SLT 94–95):

Belli: "1861.   Here is a repetition of that paraphrasing of the law of Warsaw.   1861."

"'Now as plaintiffs would try and have you believe that this pilot, Captain Dickson—he had been into the San Francisco area 120 times, knew all these mountains, knew the topography—that he would come and go down through the clouds, intentionally going down through the clouds, *and they also have to show you that he had knowledge* that in *all probability* that act *was going to result in injury,* and also the preponderance of the evidence further that he was in *complete disregard* of *that probabili-*

*ty.*   Can you imagine Captain Dickson doing anything like that?'" (Emphasis supplied.)

"I couldn't.   And if that was the law, we had better go to Congress and change Warsaw, but fortunately, it isn't."

NOTE BY THE COURT:  Again, a misstatement of the law, in four particulars.

29.   Plaintiff's Criticism (SLT 95):

Belli quotes Parker, (page 95):

"No!   He was over the top.   He had to listen to his radio signals.   He couldn't see through the clouds. When he received the proper signals, he started the letdown, he intentionally went into those clouds."

NOTE BY THE COURT:  (a) "When he received the proper signals, he started the letdown, he intentionally went into those clouds."

There is no evidence the pilot received the proper signals.   Unsworn testimony by counsel not cross-examined—and speculation, surmise, guesswork.

Furthermore, there is no evidence that he could have received the signals from the ILS outer marker anywhere else than in its vicinity.   And, there is no evidence that the ILS signals could be confused with any other in or near the area of the crash near Half Moon Bay fan marker.

(b) Belli says (P. 96):

"I must retract when I say that some of those were inadvertent.   I think some of these were cleverly conceived as a result of three trials, and the plan was determined this time that there could be *no essay into speculation,* but *this time* that *the evidence must come from counsel as he argued the case.*

"Let me read that again:

"'When he received the proper signals, he started the letdown, *he intentionally went into these clouds. There is no question about that.*   We will demonstrate that to you ladies and gentlemen in just a moment.'" (Emphasis supplied.)

30. Plaintiff's Criticism (SLT 96–98):

Belli: "And then, then he went into the overlay that your Honor said cannot be done. That is their theory of the case this time, that they were going to demonstrate the overlay, and your Honor wouldn't let them do it with the celluloid. Then he went into it—"

NOTE BY THE COURT: The matter of the overlay was discussed between court and counsel at T 1281–1285; T 1322–1328; T 1331–1338.

The court stated his position at T 1336–1339.

Parker went into the matters the court excluded starting at T 1862.

Belli says: (SLT 96–97) "And your Honor admonishes him at 1281."

The admonition appears at T 1389–90:

"MR. GERRY: I have no objection to the range leg of the Salinas, your Honor, as long as counsel, in his argument, is restricted to the facts as presented by the witnesses here.

"THE COURT: Of course, he is going to be restricted. If I haven't already told you, and I think I have, I have said to you that I am going to have the reporters take down your argument to the jury, and I am going to require you to stick with the evidence. We are not going off on any frolic all over the landscape in the argument to the jury."

From T 1336–1338:

(a) "Well, I will tell you what it looks like now, tentatively, to me. It looks like you folks have got some material here that you are offering in evidence which is, to say the very least, very remote. If it weren't very remote, if all these things could happen in combination and adversely, as is being suggested in the argument, how does one ever fly an airplane into the San Francisco International Airport? How is it that during closed in, heavy fog and overcast conditions there is traffic going in and out of that airport all the time? Instrument flying is ordinary procedure there. ILS landings are ordinary procedure there.

"If the inferences which you folks are suggesting to me and which you are going to suggest to the jury are to be taken as having any value at all, one's next inquiry is: well, no one should ever operate a plane in that area with these facilities, these possibilities, with all of this misleading stuff that is going on all the time, range lights whipping around, ILS markers giving deceptive information, the various other things that you folks have been referring to.

"One after another of these radio aids has been criticized: The imperfections are being, I think, emphasized beyond the reasonable inferences that can be drawn.

"A fairly reasonable inference, if the jury thought it were a fairly reasonable inference, is a permissible inference. But to have suggestions of the type that are now implicit in the moving of that overlay—let's take the whole works, imperfections and all—down to the Half Moon Bay fan marker and suggest that all of these phony signals one way or another combined, it was a coincidence of them, and that the fellow went off into Kings Mountain because of that seems to me to be a very remote sort of thing.

"Secondly, it seems to me that the inference upon inference upon inference is based upon no fact at all. Somewhere back there there must be a fact from which the inferences and the chain of inferences can be started.

"And, thirdly, it seems to me that the chain of inference is broken.

"And, fourthly, it seems to me that we are running into a lot of collateral issues and it may take us weeks to try those collateral issues.

"And, fifthly, it seems to me, without any question at all I am persuaded, that this kind of thing can mislead and confuse that jury."

(b) The court also said, 1339:

"Now, therefore, I am asking you folks, before I rule on it, to get me the authority upon which you stand for its admissibility. You are offering that evidence. I am placing the burden upon you to present to me some authority which justifies my admitting it."

"MR. MAGNER: Yes, sir. We will accept that and go to work on it right away."

31. Plaintiff's Criticism (SLT 100–106):

Belli says: "Well, we heard nothing more, and there was no law whatsoever on admitting speculative—it is a very simple statement in this case, your Honor. We have an airplane that comes in over Half Moon Bay that is supposed to go to there and can't let down until it gets there. It lets down over here. We show everything is working there on that day, everything is working inside the plane on that day. We have all the presumptions and inferences. Then they say, 'We want to come in, No. 1, again: The air is for the birds. Maybe he had a heart attack. Maybe a range leg bent. One bent on October 4th. Maybe there was something wrong with the propellers.' They can't do that, because the CAB checked that all out there.

"Did they produce one case in contravention of that Shannahan case with reference to the remoteness of these things bending on October 4 or some other time?

"Suppose you have the heaviside layer, the aurora borealis, that may bend a range leg at some time in the distant past. Is such speculation that lightning might hit a train—it didn't happen in this case, as the court in this Moore against Santa Fe—they threw it out and gave an n. o. v. But regardless of any of that, the southwest range leg, the Half Moon Bay fan marker, regardless of all of those things out there, your Honor, there is one thing in this lawsuit, and it can be put in two paragraphs: There is no evidence whatsoever in the world to dispute that this ILS outer marker is a geographical position. It goes up in the sky. It does not move. It does not change. It does not fluctuate. It has a fail-safe. And on that day it was working and they were told to go to that before they let down. And he didn't go to that before he let down. And he couldn't get that signal any other place but here.

"Even admitting, which is not in evidence, that Half Moon Bay was wrong, that the southeast range leg was wrong, that radar was wrong, and everything was wrong, he couldn't go down until he went over this. And that does not simulate at any place else, and there's nothing in the record—they didn't even try to put anything in the record—that this thing can change, other than the particular light on that dashboard, or trains, that ADF, and the third check.

"And there is nothing that will do what this thing does when they go over it.

"That is the case. It is that simple.

"Let me, if we may, try and conclude this.

"And as they say, your Honor, I think their admission on page 1862:

" 'When he received the proper signals, he started the letdown, he in-

tentionally went into those clouds'— "They know he couldn't let down until he got the proper signals. And we have shown that you can't get those signals anyplace else but a place that was safe, and there is no bit of evidence whatsoever in this record that that man could have been mistaken on the evidence or on facts that would confuse him as to where this was.

"Where is the overlay now that your Honor said they couldn't use? *Here is what they did: They moved this ILS outer marker by the process of adroit forensic legerdemain from 12 miles, a feat that science and law won't sit still for. They moved it over here, and then they had him coming down over here.*

"I think we even proved *motive* in this case, what that fellow was doing when we accused him of taking that shortcut in sunny weather and in other kinds of weather. He couldn't be sure it was always sunny weather, he said. And over a period of a long time they and Philippine Airlines—*not a man from their company took the stand to deny that.*

"We don't have to prove motive or intent. We don't have to show what is in the man's mind. Or you would never be able to put a man into jail.

"We show the circumstances that show that those things were operating, those things were operating, and this man must have, must have known that he was taking a shortcut, and the worlds and hours of the day and the seconds and minutes are full of people who jump the red signal. It only saves them two seconds perhaps, but they do it, regardless of the consequences. If they had stopped to think, maybe they wouldn't do it.

"But in the air it is a different thing, jumping a signal, when there are no automobiles around in the air. And when you do something like that in the air, then, as a matter of law you have to be penalized for the consequences if you intentionally do that; it is wilful misconduct.

"Here is the overlay at 1862, after he has been admonished on this.

*"It would be difficult, may it please your Honor, to, within these few pages, starting at—61 pages, 61 pages, to have a primer of what not to do. And I say this in all generosity, what not to do in an argument to a jury, an ethical argument to a jury.* And I say that as a prelude to this again. 1862. We are leading up to this radar.

"And *how handsomely are your Honor's objections and admonitions overridden.* We will have it in the record and spelled out, that *this man paid no attention to counsel, to Court, or to law, because he set out upon a course.* Other counsel says, "Speculation is all we have.' "

"He says, 'Well, if speculation won't do it, *we won't submit the records of our company, what we did.* I can submit the facts of this case better in argument and say the other side is confused.' "

"That's what happened."

(Emphasis supplied.)

"Mr. Gerry reminds me to read 1142 of Lucas:

" 'You got his turning immediately that he gets into this area, right?

" 'Answer: Immediately he received the overhead of the ILS outer marker.

" 'Question: He has to establish that he has passed over it by the reversals, and they are not going to reverse it until he passes over it?

" 'Answer: As you pass directly overhead.

" 'Question: When you pass directly overhead, they will be *wavering?*

" 'Answer: Yes.

" 'Question: And then you have to get by it and then turn around?

" 'Answer: Yes, a matter of seconds.

" 'Question: You may be pulling this turn in just a little bit here on the map between what you can actually do and establish your fix?'

"*But there is no testimony,* and as we can put it down in writing so that we can check it out for every page there, this doesn't waver, this ILS, and there is no question of their trying to get it to waver, regardless of whether we were to admit that the Half Moon Bay wavered.

"If he came in at Half Moon Bay or were way out half way to Honolulu and he sees it way out there or he gets it someplace else, *he can't do anything else until he goes over this ILS outer marker. And this doesn't change.*

"The case is as simple as that and maybe we should have put on two witnesses and explained that to the jury. But we are thankful that we put on all of the witnesses and now, and on this day, on a motion for directed verdict reserved, we have an opportunity to explain this whole thing to the Court."
(Emphasis supplied.)

32. Plaintiff's Criticism (SLT 107):

" 'Is that pilot going intentionally to go down through that overcast in this area *knowing* that in *all probability he is going to run into the side of the mountain?* And that is what the plaintiffs have to show.' "

"And *again* and *again* and *again.* 1863, your Honor.' (Emphasis supplied.)

NOTE BY THE COURT: Misstatement of law again.

33. . Plaintiff's Criticism (SLT 107–108):

"Then over to 1864, the shortcut.

"You see, Mr. Parker didn't ask one of their witnesses, and they didn't bring a witness, to deny the accusation of this established airline— Quantas is involved—that they shortcut. He didn't bring a witness because he could substitute by argument the fact.

"And he so does on 1864.

" 'The shortcut—ladies and gentlemen, we know that the airplane made a right turn here, from Alicea.'

"Despite the fact that when Alicea was asked by him, *Did he make a turn? He said no.*" (Emphasis supplied.)

NOTE BY THE COURT: The silence of defendants on this point shrieks.

They have nothing to say in their Memo of May 25th on this one.

Three trials, London, Australian, New York, and San Francisco legal counsel, eight years since the air crash, and not one witness to refute the custom and practice of BCPA to take that so-called shortcut.

34. Plaintiff's Criticism (SLT 108):

Belli says: "And again Alicea, page 1866:

" 'That is what the pilot should do. What did the pilot do? We know that he made a turn to the right. The testimony of Raymond Alicea over the Half Moon Bay, in this area here some place (indicating) is he made a turn to the right.'

"Despite three and four times the admonitions, the record not being that way, repeated, repeated, repeated. Like rain from the tin roof which falls and falls upon the ears of the jury in hopes, as it did here, that they will believe him rather than the record, particularly when he knows that we have been in chambers most of the time and the jury has been out there."

35. Plaintiff's Criticism (SLT 108–109):

Belli: "Now let's go over to 1866, and we are coming down, I think, to one of the more brazen ones. I think charitably I characterize it with that expression—on page 1868.

" 'Is the pilot going to call "Southeast turning inbound" *when he knew* that the radar at San Francisco Air-

port was tracking in the airplanes, and as a matter of practice day in and day out at this time—'

"MR GERRY: I object."

"And recall, your Honor, how few objections, because we relied then, of course never thinking that this moment would ever come, but we did rely on the problem of objections until this matter could be discussed between lawyers and lawyers and judge and lawyers as we are doing now.

"1868.

"'MR GERRY: I object. There is no evidence that this pilot knew anything about the radar at the San Francisco Airport.

"'THE COURT: The objection is sustained.

"'MR. PARKER: All right. There was radar there. Captain Lucas—

"'MR. BELLI: Just a moment. Your Honor has admonished counsel, and I think we have had enough of this.

"'THE COURT: Yes.

"'MR. PARKER: If the Court please—

"'MR. BELLI: Let us hear from his Honor, please, Mr. Parker.

"'THE COURT: Stay with the record. That is why I have the reporters here taking this oral argument.' "

36. Plaintiff's Criticism (SLT 110):
Belli, quoting Parker:

"'MR. PARKER: I will read you the testimony of Mr. Beck, the witness we produced who was operating the radar position in the San Francisco Tower at that time.'

"And then we go on with Mr. Beck over to 1870, and when he reads, he reads anything but that which will substantiate his contention."

"THE COURT: What page?

"MR. BELLI: As we read from 1868 through 1869 to 1870.

"'That is where you usually picked them up, at the outer marker, and monitored them in on, isn't it?

"'Answer: No, it is not.' "

"And then he stopped. He misspoke himself there, or he read a little bit too much.

"Then he says, since he can do much better by giving the evidence than by the record.

"'And then you recall—' And this to the jury.

"'And then you recall the rest of his testimony that they could follow the track of an airplane all the way approaching on an instrument letdown from Half Moon Bay and follow him in.'

"That's not the record. At page 1165, 1167, and 1168.

"THE COURT: 1160 what?

"MR. BELLI: 1165, 1167, and 1168."

37. Plaintiff's Criticism (SLT 110–111):

Belli: "Now this is the overlay that he is doing now, after being admonished by your Honor that he couldn't do it.

"1170.

"'Now, ladies and gentlemen, these are facts we know. We know that he turned to the right.'

"Again and again and again and again.

"'We know he had the flaps down. We know he had the gears down. We know he had the propellers at 2400 revolutions. We know he was at the proper place for the procedure turn over here.'

"Now, your Honor, what they have done is to take glibly and blithely this marker here and put it over here. Good heavens, the steamship that is trying to berth in that pier— Mr. Parker would say, 'It would have berthed it, but the pier was only 50 feet over there so let's move it over here.' "

"Now, that is just exactly what happened in this case, at 1870. He knew that he was at the proper place for the procedure turn over here. 'We know that he called inbound, and we know the airplane hit the mountain at a heading of 45 degrees, the heading at which he should make the turn.' "

"Is there any evidence of this?"

38. Plaintiff's Criticism (SLT 111–112):

Belli points out the misstatement of the law again:

" 'Where do we have any evidence at all of an intent to do an act, this wilful misconduct, intent to do an act *knowing* that in *all* probability it is going to result in *this* injury, and with *complete*—' 'and,' 'and,' 'and,'—"

"THE COURT: What page?

"MR. BELLI: 1871, your Honor.

"THE COURT: 'This injury'?

"MR. BELLI: 'This injury.' '— and with complete disregard to that probability.'

"And again it is a simple thing. The intent is manifest in the commission or the omission of going down before he went over the navigational aid."

39. Plaintiff's Criticism (SLT 112–113):

Belli quotes Parker:

" 'Now, negligence does not come into this case at all, ladies and gentlemen. The Court will so instruct you. We are talking about wilful misconduct.'

"Now, listen to this:

" 'Someone made a mistake here.'

"And I come back to this again. If someone made a mistake, the only person who could have made a mistake was they, and the only mistake they did make was not going over that outer marker, because they made no other mistake. And not going over that outer marker, they

can characterize it as negligence, but it has to, under the law and under these authorities be wilful misconduct, because it is up in the air, where a second makes 50 times the difference of a slow-moving boxcar that doesn't obey the signal when they are going across the track.

"Listen to this:

" 'Someone made a mistake here.'

"You see, Mr. Parker is half gallant. He says, 'Maybe it was our pilot.' "

"But listen to the end of this. And then comes the venomous sting from failure to adhere to the record.

" 'Maybe it could have been our pilot. We don't know.'

"And here is the sentence:

" 'If no mistake had been made *either on the part of the radio facility maintenance* or our pilot he would have landed safely.'

"Now, I am not so concerned that he misstated the record, or his manner or conduct in arguing this case, as I am that he had no evidence to rebut our proof that this pilot violated a navigational order, which would have entitled us, we respectfully submit, to a directed verdict."

NOTE BY THE COURT: Any fair-minded person who reads this record must conclude there is no basis in the evidence for Mr. Parker's statement: "If no mistake had been made either on the part of the radio facility maintenance or"—the pilot would have landed safely.

First: There is no evidence of a mistake by radio facility maintenance. Second: There is no evidence whatever that any such caused this crash and prevented the pilot from landing safely. Third: New York counsel, in their Memo of May 25, 1961, offer an insult to intelligence in their "Comment" page 50:

"COMMENT: Since Mr. Parker made no reference in these remarks to the evidence in the record it is difficult to understand how he could have 'misstated the record.' Since the pilot was using a secondary re-

ceiving frequency it is a valid inference that his radio facilities were not completely normal, a maintenance problem."

Underscore the word *"his"* (The pilot's) radio facilities were not completely normal, "a maintenance problem." *Defendant's* Maintenance Problem!

40. Plaintiff's Comment (SLT 113–114):

Belli: "Then we go over to 1872:

" 'They are trying to build a case on this confusion. The airplane couldn't have gone from either the Half Moon Bay fan marker or the intersection to the outer marker and back to the crash site and made a turn in that amount of time.'

"There is the admission, your Honor, that that airplane could not have gone over the ILS outer marker.

"THE COURT: What page?

"MR. BELLI: 1872.

" 'They say that he must have known that he did not go over the outer marker because there wasn't enough time. In the first place, the preponderance of the evidence is that it isn't 39 to 44; it is past 45.'

"And in their own record again and again and again in the inter-company memo they say that it was 8:44, that they are satisfied to place blame within the company, that it was 8:44.

" 'And the evidence shows that 39 could have been after the transmissions were made.' "

41. Plaintiff's Criticism (SLT 114–115):

Belli points out that Parker directed the jury to bring in a verdict for the amount in the Warsaw limitation:

"The direction: 'And if you follow your oath as a juror you can do nothing but bring in the limitations as the Court will instruct you under the Warsaw Convention.' "

42. Plaintiff's Criticism (SLT 115–116):

Mr. Belli concludes:

"Now, that, may it please your Honor, is the transcript, without going into more on this question that there was an evidentiary insufficiency. And we respectfully submit that under the Moore against Santa Fe procedure there of directed verdict or n. o. v. and under this Federal rule as set forth in here, and speaking of the more scientific manner in which these cases are to be disposed of, we would respectfully submit that if there ever were a case in which there is no evidence whatsoever on the part of the defendant and in which we not only have sustained our burden of proof of showing something that a man was to do and then showing that he didn't do it and then showing that he couldn't have in any manner been confused— if ever there were a case in Warsaw or anything else where we are entitled to a directed verdict and to take this matter then upstairs or to the Supreme Court so we would get the uniformity between the circuits on this and then to try this on the issue of damages, as is the new trend and as was indicated in the Moore case, I would respectfully submit that it is this case here.

"We have argued misconduct here, and again we have argued that only so it would be in the context of showing that they had no evidence to rebut this.

"And again, what Mr. Parker said, or Mr. Wallace said, in the first trial and what Mr. Parker did in the second trial in the overlay indicates that they will not try this case on the evidence, and despite all of your Honor's orders, they still refused to give us the company records, the simulated flights, the record of this pilot and his evidence that your Honor has ordered them to hand up to us.

"I would like, if we may, knowing that we have taken far longer than

we anticipated, may it please your Honor—I would like Mr. Gerry just very briefly on this to point up what the evidence proves from the point— it may be overlooked—the point that we left him on the radar from Tamalpais out on the Zulu Line, we know that there is no dispute on that, and then the company records that says that he was eight miles to the south of the intersection.

"I wonder if your Honor recalls that. But that we got out of them."

## APPENDIX C

### THE COURT'S CHARGE ON LIABILITY

THE COURT: Ladies and gentlemen of the jury, we are nearly to the conclusion of this trial. You have listened to the statements of counsel, both at the beginning and at the end of the trial. You have heard the witnesses and observed them upon the witness stand. You have seen the exhibits. Now, it is my duty to tell you folks about the law that governs this case, and to state for you just what it is we are asking you to decide.

I am going to try to explain this case, ladies and gentlemen, in such a fashion that you, who are lay people, and not familiar with international treaties, with air navigation, nor with the law, will have some, I hope, clear understanding of what it is we are about here.

It is your obligation under your oath to pay strict heed to what the Court has to say about these matters. I would not be talking about them if they were not important. We are all bound by the law. I am bound by it all the time. And so, too, are you bound by it in this case.

To start with, you know, of course, that the airplane involved in this crash was flown from Sydney, Australia, by way of the Fiji Islands and Honolulu to Half Moon Bay on the coast of California south of San Francisco. Its destination was the San Francisco International Airport. As, of course, you all know, it did not arrive there.

The airplane was owned and operated by the defendant, The British Commonwealth Pacific Airlines, and at the time it crashed into Kings Mountain, near San Mateo, California, it was operated by a flight crew employed by and working for the defendant British Commonwealth Pacific Airlines.

The members of the crew of that airplane were agents and employees of the defendant, and they were acting within the course and the scope of their employment at the time of the accident.

An employer is responsible in law for the acts of its agents and employees while they are transacting the business of the employer, and in this case, ladies and gentlemen of the jury, the defendant is legally responsible for the misconduct, if any you find, of the nature I shall describe to you, of the pilot or of any member of the crew aboard that airplane.

These things you may take as having been established in this case.

This was an international flight, and the defendant British Commonwealth Pacific Airlines was a foreign air carrier. Already during the course of the trial you heard in this case about the Warsaw Convention. The Warsaw Convention, ladies and gentlemen of the jury, is an international agreement, or a treaty, if you please, which the United States has entered into with various other nations of the world. It is called the Warsaw Convention because the conferences that were held between the delegates from the respective nations met in Warsaw in the late 1920s.

By reason of the fact that this was an international flight, and the fact that the. defendant British Commonwealth Pacific Airlines, was a foreign air carrier, the Warsaw Convention applies to and governs this case.

The treaty or agreement, contains some provisions which, therefore, I must discuss with you.

Article 17 of the Warsaw Convention imposes an absolute liability upon the air carrier for all personal injuries, regardless of fault, "if the accident which caused the damage so sustained took place on board the aircraft." The accident which caused William Kapell's death did take place on board the aircraft.

But, this liability is excused by Article 20(1), if "the carrier proves" that it has "taken all necessary measures to avoid the damage or that it was impossible" for it to take them.

As to this, the burden of proof is upon the carrier. And what this means, ladies and gentlemen, in the case now before us is that the defendant British Commonwealth Pacific Airlines is liable to the plaintiff in the amounts which I shall give you in a moment, unless the defendant British Commonwealth Pacific Airlines produces evidence here which you believe and which satisfies your minds by a fair preponderance of the evidence that the defendant, its agents, its pilot or flight crew, took all necessary measures to avoid the damage, or that it was impossible for it or them to take such measures.

If you are not so convinced by the defendant your verdict should be for the plaintiff and against the defendant in these amounts:

For the death of William Kapell, $8,-291.87.

For the loss of checked baggage, $497.-40.

For the loss of personal effects not checked but carried with him on the plane, $331.61.

Now, these amounts are arrived at by translating 125,000 francs, which is the term the Treaty uses, into dollars and cents. The Treaty is written in French, ladies and gentlemen of the jury, and we have to interpret that Treaty into our own language.

Now, upon this phase of the case, the phase about which I have been speaking, the defendant British Commonwealth Pacific Airlines must carry the burden of proof and convince and persuade you

ladies and gentlemen of the jury by a fair preponderance of the evidence.

I leave the subject about which I have been speaking, and we now turn to another Article of the Warsaw Convention which removes those limits upon the amounts that may be recovered in an airline crash.

Article 25 provides that the air carrier shall not be entitled to avail itself "of the provisions of this convention which exclude or limit" its liability if the damage is caused by its "wilful misconduct."

That provision of the Warsaw Convention removes the limits upon the defendant air carrier's liability and entitles the plaintiff to recover whatever damages, in excess of the amounts I have mentioned, that the plaintiff is able to prove to your satisfaction and that you ladies and gentlemen in your good judgment may determine if you also find the conduct of the defendant British Commonwealth Pacific Airlines or its flight crew to have been "wilful misconduct."

If what the pilot or crew did, or failed to do, was "wilful misconduct", there are no limits imposed by the Warsaw Convention upon the damages that may be recovered.

We have been a long time arriving at this point, ladies and gentlemen, but now we come to the heart of this case. Now I shall try to define for you what is meant by "wilful misconduct."

First, I will tell you what it does not mean. It does not mean that defendant British Commonwealth Pacific Airlines, or any of its employees had a deliberate intention to kill William Kapell, to wreck this airplane, or to commit suicide. In other words, it is not necessary for the plaintiff to prove that the pilot intended to cause the harm which resulted from his conduct.

To illustrate the principle I am attempting to explain to you, let me say this. If the pilot in an airplane is instructed by the tower to stay at least 500 feet on top of a cloud cover, and if he is further instructed not to descend into the clouds until he goes to the outer

marker of the instrument approach to the runway and receives the ILS outer marker signal, which means the instrument landing system outer marker signal, and if he nevertheless descends into the clouds, knowing he has not passed over the ILS outer marker, the requisite intention is present if he intended to violate his instructions and to do what he was doing. In order for his conduct to be "wilful misconduct" he need not have intended to cause the harm which resulted from that conduct.

"Wilful misconduct" is the intentional performance of an act in such a manner as to imply reckless disregard of the probable consequences of the performance of the act.

Likewise, the intentional omission of some act in a manner from which could be implied reckless disregard of the probable consequences of the omission, would also be wilful misconduct. By an omission of an act is meant the failure to do an act, for example, in this case the plaintiff complains of the pilot's failure to follow his instructions from the San Francisco International Airport tower.

The probable consequences of the act or omission to which we refer are those which affect the safety of the aircraft and its passengers.

Now, ladies and gentlemen of the jury, in further definition of the term "wilful misconduct", the pilot's conduct would be in reckless disregard of the probable consequences, that is of the safety of the aircraft and of its passengers, if the pilot intentionally did an act, or failed to do an act, which it was his duty to the passengers to do, knowing or having reason to know of facts which would lead a reasonable man to realize that his conduct not only created an unreasonable risk of bodily harm to the passengers, but also involved a high degree of probability that substantial harm would result to the aircraft and the passengers by the doing or failing to do the act in question.

Let us examine this definition carefully. It is the crux of this case. It is the definition of the term "wilful misconduct" as it is used in the Warsaw Convention, so far as it applies to this case.

In other cases dealing with other matters in different situations, not involving the Warsaw Convention, the term "wilful misconduct" has other meanings. I mention that because you have had a jury term here and you might have had the term defined for you in a different situation.

However, in this case, the one presently before us, the sense and the only sense in which the term "wilful misconduct" is used and with which we are concerned is the one I am giving you.

I wish now to break the definition down a bit and examine its elements with you. Pay strict heed to this.

There are really four elements in that definition. They are the following:

1. The intentional performance of an act or failure to perform an act.

We have heretofore examined this in some detail. He doesn't need to intend the harm that results from his act.

2. Knowing or having reason to know of facts which would lead a reasonable man or woman to realize.

3. That his conduct not only created an unreasonable risk of bodily harm to the passengers.

4. But also involved a high degree of probability that substantial harm would result to the aircraft and the passengers by the doing or failing to do the act in question.

It is my duty to explain to you, ladies and gentlemen of the jury, what is meant by the term "wilful misconduct" in the sense of reckless disregard of the probable consequences or reckless disregard of the safety of the passengers. It is then for you, ladies and gentlemen of the jury, to decide upon the evidence whether or not any act or omission of the pilot or flight crew, which you may find, amounts to reckless disregard of the probable consequences or of the safety of the passengers as I have defined those terms for you.

Carriage by air can be fraught with the gravest dangers to human life unless very high standards of care are maintained by the carrier and by its employees, the flight crew. For that reason, ladies and gentlemen of the jury, you may take into account the nature of this business, the hazards of the undertaking along with all the other facts and circumstances in evidence, and for that reason it may be that a jury would feel justified in coming to the conclusion that some relatively minor breach of a safety regulation amounts to "wilful misconduct," although it would not do so in places and on occasions when the consequences of such an approach would be much less serious.

For example, the breach of some safety precaution in a factory might give rise to some minor injury and in some circumstances the jury might think it was not an act of "wilful misconduct," but with aircraft in the carriage of passengers by air, a minor lapse from the accepted standards of safety might be regarded as an act of misconduct.

You are to take into account in this case, ladies and gentlemen of the jury, in making your deliberations, your decision and arriving at your verdict all of the facts and circumstances in proof here. You may consider all of the circumstances surrounding the alleged accident, the amount of care required of the defendant, whether in the circumstances it should be slight care, or the utmost care, the means of conveyance being an airplane, the hazards of the undertaking, and in general the amount of care that ordinarily would be brought to the transport of passengers by air, and the consequences of any violation of any rules or regulations or prescribed flight procedures which have been adopted for the safety of the passengers, as involving a high degree of probability that serious harm might result.

Much of the evidence in this case is circumstantial evidence. Circumstantial evidence is to be distinguished from direct evidence. Direct evidence is the kind of evidence that we have when a witness takes the stand and testifies to what he has seen or heard or observed or experienced through the use of his senses.

Circumstantial evidence is indirect evidence, that is to say, it rests in inference.

You ladies and gentlemen of the jury are to take into account not only the facts proven by the evidence, but you may take into account also those inferences which you ladies and gentlemen of the jury in your good common sense and sound judgment determine are fairly and reasonably to be drawn from the facts proven.

Much of the evidence in this case is of that sort. There are some facts proven, you folks are expected to draw reasonable inferences from the facts proven, and the Court charges you that you may do so.

I have been talking about knowledge in the definition of "wilful misconduct". I want specifically to refer to the circumstantial evidence with respect to the matter of the knowledge of the pilot. When a question exists whether an aircraft was conducted with knowledge that a serious injury to a passenger probably would result from certain conduct, proof of such knowledge does not have to be by direct evidence. You are instructed that you members of the jury have a right to infer that the pilot or flight crew in charge of the aircraft had such knowledge or would have had such knowledge. If you think such an inference may reasonably be drawn from the facts in evidence and if your good common sense as jurors so direct.

Defendants now admit that this aircraft never passed over the instrument landing system, that is ILS outer marker. You may infer from this and the other evidence in the case that the pilot knew he had not passed over the outer marker, or that the pilot descended into the clouds without knowing whether or not he had passed over the ILS outer marker, if in your good judgment and sound common sense you think such inferences may reasonably be drawn.

The defendant admits, ladies and gentlemen of the jury, in this case the following facts:

The undestroyed wreckage yielded no evidence of mechanical or structural failure of the aircraft prior to impact.

Next, Captain Dickson knew everything pertinent that was necessary to know about the San Francisco area.

Third, when receiving an effective radio signal from the Half Moon Bay fan marker, certain equipment in the aircraft, if being used, would normally cause to be emitted an identifying aural signal of three dashes and would energize a white light.

Next, the accident location was in a mountainous area approximately 7½ miles southeast of the town of Half Moon Bay at an elevation of approximately 1950 feet.

I must now bring your attention, ladies and gentlemen of the jury, to the Civil Aeronautics Regulations, the CAA Regs, issued and promulgated by the Civil Aeronautics Board of the United States of America.

Section 60.12 of the Civil Air Regulations promulgated by the Civil Aeronautics Board reads as follows:

"Careless or Reckless Operation. No person shall operate an aircraft in a careless or reckless manner so as to endanger the life or property of others."

Section 60.19 of the Civil Air Regulations provides:

"Air Traffic Control Instruction. No person shall operate an aircraft contrary to air traffic control instructions in areas where air traffic control is exercised."

Section 60.21 of the Civil Air Regulations provides:

"Adherence to Air Traffic Clearances. When an air traffic clearance has been obtained under the VFR or IFR rules, the pilot in command of the aircraft shall not deviate from the provisions thereof unless an amended clearance is obtained."

By VFR is meant visual flight rules and by IFR is meant instrument flight rules.

In this case the plane was making an instrument landing system approach to the airport runway on an instrument flight plan.

Section 60.46 of the Civil Air Regulations provides:

"Instrument Approach Procedure. When instrument let-down to an airport is necessary, a standard instrument approach procedure prescribed for that airport by the Administrator shall be used unless (a) a different instrument approach procedure specifically authorized by the Administrator is used or, (b) a different instrument approach procedure is authorized by air traffic control for the particular approach providing such authorization is issued in accordance with procedures approved by the Administrator."

Section 60.47 of the Civil Air Regulations provides:

"Radio Communications. Within control zones and control areas the pilot in command of the aircraft shall insure that a continuous watch is maintained on the appropriate radio frequencies and shall report by radio as soon as possible the time and altitude of passing each designated reporting point or the reporting point specified by air traffic control together with weather conditions which have not been forecast and other information pertinent to the safety of the flight."

I charge you, ladies and gentlemen, as a matter of law that there is no evidence in this case of any emergency justifying a departure from the prescribed approach procedure in this case as given by the tower of the Civil Air Regulations.

If you find, ladies and gentlemen of the jury, that the defendant or any of its employees committed one or more acts of wilful misconduct, as I have now defined that term to you, then you must go on to consider whether or not such wilful mis-

conduct, as you have found, was the proximate or legal cause of the death of Mr. Kapell. Now, to be the legal cause of this result, namely, Mr. Kapell's death, the wilful misconduct must be a substantial factor in bringing about that result.

Furthermore, there must be an actual and continuous sequence connecting the act of wilful misconduct, if any you find with the death of Mr. Kapell. I say that the wilful misconduct must be *a* substantial factor in bringing about the death. You will note I did not say it must be the *sole* substantial factor contributing to the death. In other words, if you find that wilful misconduct by the defendant or any of its employees was a substantial contributing factor to the death of Mr. Kapell, that is sufficient to sustain the plaintiff's claim even though you may find that there were also other substantial contributing factors.

Ladies and gentlemen of the jury, in this case upon the question whether or not the defendant or any of the members of the flight crew or any agent or employee of the defendant committed acts or failed to commit acts intentionally which amount to wilful misconduct, as I have defined the term to you, the plaintiff has the burden of proof upon the issue, that is whether or not the conduct of the defendant and its employees amounted to reckless disregard of the safety of the passengers and whether such misconduct, if any you find, was the cause of the death in this case. That is to say, was the direct and proximate cause of the damage.

That burden which rests upon the plaintiff is to produce evidence here before you which you believe and which satisfies your minds by a preponderance of the evidence. You are instructed that the plaintiff does not have to prove his case to a moral certainty or beyond a reasonable doubt. That is the rule in criminal cases only, and I mention this only because you ladies and gentlemen of the jury may have tried some criminal cases here during this jury term and you may have some confusion in your minds about the difference between the two burdens. This is a civil case as distinguished from a criminal case and less proof is required. A mere preponderance of the evidence is all that is needed for you to find a verdict in favor of the plaintiff on these issues. By the term "preponderance" I mean simply the greater weight of the evidence or that evidence which to you has a more convincing force and effect.

If the probability of truth favors a party, he has carried his burden of proof. So while the burden of proof in this case is upon the plaintiffs to sustain the allegations of their complaint by a preponderance of the evidence, the plaintiff is not required to produce evidence which convinces you beyond a doubt nor beyond a reasonable doubt.

Now, ladies and gentlemen of the jury, I put the case to you. If you should find, ladies and gentlemen of the jury, that the defendant or any of its agents, servants or employees knowingly and intentionally violated any of the Civil Air Regulations or the landing instructions from the San Francisco Approach Control Tower heretofore read to you, and if you should find, further, that this violation was a direct and proximate cause of the death here involved, then the Court instructs you that the defendants are liable to the plaintiffs for the damages caused by that death without limitation. If you ladies and gentlemen of the jury also find that such conduct was "wilful misconduct" in the sense of reckless disregard of the probable consequences and reckless disregard for the safety of the passengers, as I have defined these terms for you, now, if you so find, ladies and gentlemen of the jury, you should find for the plaintiff and assess plaintiffs' damages.